UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SHAKEMA PHILBERT,

                                          Plaintiff,                    21 Civ. 3119 (PAE)

                          -v-                                           OPINION &
                                                                        ORDER
CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF EDUCATION, CAMILLE
FORBES, and KERIANNE HARRISON,

                                          Defendants.

---

PAUL A. ENGELMAYER, District Judge:

    This case involves discrimination and retaliation claims by a former New York City

elementary school teacher.  Shakema Philbert worked for the New York City Department of

Education ("DOE") between 2011 and 2019.  Philbert sues the City of New York (the "City"),

DOE, and two individuals affiliated with DOE who supervised her (together, "defendants")

under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"), Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), New York State Human

Rights Law, New York Exec. Law § 290 *et seq.* ("NYSHRL"), New York City Human Rights

Law, N.Y.C. Admin. Code § 8-107 *et seq.* ("NYCHRL"), and common law.

    Pending now is defendants' motion to dismiss under Federal Rules of Civil Procedure

12(b)(1) and 12(b)(6).[1]  For the following reasons, the Court grants the motion in part and denies

it in part.  Philbert's ADA retaliation claim is the sole claim to survive.

---

[1] Defendants style their motion as one to dismiss under Rule 12(b)(6), but also move to dismiss
based on jurisdictional deficiencies, which the Court reviews under Rule 12(b)(1).

I.      **Background**

    A.      **Factual Background**[2]

        1.      **The Parties**

Philbert is an African-American woman who lives in New York.  She has experienced chronic migraines and, as a result of a 2017 workplace incident described below, an injured left hand.  SAC ¶¶ 8, 14, 21.  She began working at DOE in September 2011.  *Id.* ¶ 13.

The City is a municipality duly organized and existing under New York State law.[3]  *Id.* ¶ 9.  DOE was and is an entity of the City.  *Id.* ¶ 10.  Camille Forbes is the principal at Public School 206 Jose Celso Barbosa ("PS 206"), which DOE runs.  *Id.* ¶ 11.  Kerianne Harrison is the principal at Public School 194 Countee Cullen ("PS 194"), also run by DOE.  *Id.* ¶ 12.

        2.      **2011–2015: Philbert's Early Career at PS 206**

In September 2011, Philbert began work at PS 206, as an elementary school teacher working with special education students for the 2011–2012 school year.  Her supervisor was Forbes.  *Id.* ¶ 13.

At this time, Philbert experienced chronic migraines, which would cause "visual and speech impairments, difficulty hearing [and] sleeping, concentration issues, sensitivity to light,

---

[2] These facts are drawn from the Second Amended Complaint.  *See* Dkt. 22 ("SAC").  For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of the plaintiff.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  The Court also takes judicial notice of documents attached to, integral to, or referred to in the complaint, including Philbert's New York State Division of Human Rights ("SDHR") filings and the SDHR's determination, which defendants submitted with their motion to dismiss, Dkt. 25.  *See, e.g.*, *Isbell v. City of New York*, 316 F. Supp. 3d 571, 587 (S.D.N.Y. 2018); *see also Littlejohn v. City of New York*, 795 F.3d 297, 305 n.3 (2d Cir. 2015).

[3] Defendants argue, and Philbert does not dispute, that the City is not a proper party because it is a different legal entity than its DOE.  *See* Dkt. 26 ("Def. Mem.") at 8; Dkt. 29 ("Def. Reply") at 1.  The Court therefore dismisses all claims against the City.

nausea, fatigue, and pains associated with throbbing and pulses." *Id.* ¶ 14.  In or about November 2014, Philbert told Forbes about her migraines and her symptoms.  *Id.* ¶ 15.  Philbert had several doctor's appointments and asked PS 206 for accommodations.  *Id.* ¶ 16.

On February 13, 2015, Philbert requested leave from PS 206 for surgery to alleviate her migraines.  *Id.* ¶ 17.  On February 18, 2015, she "underwent an angiogram and endovascular treatments of the right transverse sigmoid junction and coiling of the diverticula."  *Id.* ¶ 18.  On February 23, 2015, Philbert's doctor cleared her to return to work on March 4, 2015.  *Id.* ¶ 19.  On both February 13 and February 23, 2015, Philbert emailed Forbes about her condition and leave, and submitted a doctor's note when she returned to work.  *Id.* ¶ 74.  On June 9, 2015, Philbert informed Forbes that stress affected her health and disability, namely, by causing her migraines.  *Id.* ¶ 20.

### 3.    2017–2018: Discrimination and Harassment at PS 206

#### a.    Assault on Philbert

On April 7, 2017, a student at PS 206 assaulted Philbert.  *Id.* ¶ 21.  Her ulnar and radial collateral ligaments in her left thumb were torn, and a muscle in her left hand was strained.  *Id.* The SAC alleges that, as a result of these injuries, Philbert's abilities to grip, hold things, and use her left hand have been negatively affected.  *Id.*

#### b.    Forbes's representations regarding tenure

During the 2017–2018 school year, Forbes allegedly represented, in two ways, that Philbert would be granted tenure.  *Id.* ¶ 23.  First, on April 26, 2017, Forbes emailed Philbert about a visit by the deputy superintendent and said that the visit would be "a good opportunity to assist [Philbert] on being granted tenure" for that year.  *Id.*  Second, in or around mid-June 2017, Forbes met with Philbert and a "meet and tenure coach," Millicent Goodman, "to discuss the best way for [Philbert] to obtain tenure" in that year.  *Id.*

### c.   *Philbert's requested claims and leave*

Although Forbes was notified of the assault and filed a report about the incident, Philbert's own report "was delayed due to an administration failure" to follow protocols by providing or completing a DOE comprehensive injury report.  *Id.* ¶ 22.  Those reports are used to determine Line of Duty Injury ("LODI") eligibility.  *Id.*  On May 1, 2017, Philbert was given the relevant form.  *Id.*  In or about June 2017, Philbert filed a notice of claim against DOE and the City for her hand injuries.  *Id.* ¶ 24.  She ultimately chose not to pursue that claim.  *Id.*

Philbert went to physical therapy in the months following her injury.  *Id.* ¶ 25.  On or about August 18, 2017, she had surgery, which made her unable to work until October 5, 2017. *Id.*  In or about September 2017, Philbert filed a LODI claim for her hand injuries, which was denied by DOE, allegedly without justification.  *Id.* ¶ 26.  As a result of the denial, Philbert could not get her therapy sessions covered by insurance, which prolonged her rehabilitation; she lost wages while on medical leave; her insurance coverage lapsed because she was no longer on the payroll; and she paid out-of-pocket for medical expenses.  *Id.* ¶ 27.  After the initial denial, she continued to be denied coverage, and could not access healthcare.  *Id.* ¶ 28.  Philbert also requested LODI leave from September 5 to October 4, 2017, which was also denied.  *Id.* ¶ 29.

### d.   *Retaliation by Jimenez and Forbes for claims filed*

In or about October 2017, after Philbert filed a notice of claim for the assault and its accompanying injuries, defendants allegedly retaliated against and harassed her.  *Id.* ¶¶ 23, 30. Specifically, in October 2017, and "on several occasions thereafter," PS 206's assistant principal Yaira Jimenez moved the furniture in Philbert's classroom without Philbert's permission and for no reason.  *Id.* ¶ 30.  After Jimenez moved the furniture, Philbert had to put the furniture back, but because of her "injuries and disabilities," could do so only with the help of others.  *Id.*  The

SAC alleges that similarly situated teachers without disabilities "were not treated this way and did not have their furniture moved." *Id.*

On or about October 8, 2017, Philbert complained to Forbes about the discrimination and harassment she claimed to be experiencing, emailing Forbes to "express[] her frustration" with Jimenez's moving the classroom furniture. *Id.* ¶ 31. Philbert explained that she needed the classroom set up a certain way to accommodate the injuries to her hand, and that Jimenez's conduct could interfere with Philbert's hand's rehabilitation. *Id.* Even so, Jimenez continued to move Philbert's classroom furniture, including on November 3 and 14, 2017. *Id.*

Also on October 8, 2017, Philbert emailed Forbes that Philbert's doctor had extended her medical leave. On October 9, 2017, Philbert went out on medical leave because of "her injuries and disabilities [of] her hand," exacerbated by her moving of the furniture. *Id.* ¶ 32. On October 20, 2017, Philbert received a letter from Forbes stating that Philbert had "effectively abandoned her teaching position." *Id.* ¶ 33. She remained out on medical leave until November 2, 2017. *Id.* ¶ 32.

On November 14, 2017, Philbert met with Forbes and Jimenez. *Id.* ¶ 34. She reiterated "many of her frustrations from the October 8, 2017 email," including that the furniture movement had impeded her hand's recovery, and asked Forbes and Jimenez to stop harassing her. *Id.* Philbert was told that she needed to start packing up from her first-floor classroom, in order to move to the third floor. *Id.* Philbert asked Jimenez to explain why Jimenez kept moving the furniture, and immediately thereafter "left the meeting in tears." *Id.*

Philbert emailed and complained to her union representative about the alleged discrimination and harassment she was experiencing. Despite Philbert's complaints, "no action was taken to prevent any further discrimination and harassment," and, as described,

discriminatory acts therefore were taken "in retaliation for [Philbert] seeking claims and complaining about treatment connected to her hand injury." Such conduct, the SAC alleges, created a hostile work environment. *Id.*

> e.   *Further discriminatory acts*

The SAC alleges several discriminatory acts between late 2017 and early 2018. During this period, Forbes changed the locks on Philbert's classroom and refused to give her keys. *Id.* ¶ 35. Philbert was also required to cover other classes on five dates between November 3, 2017 and January 8, 2018. In contrast, similarly situated teachers who did not have disabilities "had keys to their classroom and were not forced to 'float' from class to class." *Id.*

On November 3, 2017, Philbert was threatened with disciplinary action, and Forbes told her that she would have to cover for another teacher. *Id.* ¶ 41. Because of the discrimination and hostile work environment that Philbert was experiencing, she took an "unpaid restoration of health leave of absence" from November 15 to December 21, 2017. *Id.* ¶ 36.

On or about January 17, 2018, Philbert got a letter from the school secretary, threatening disciplinary action and requiring her to meet with Forbes in five days. *Id.* ¶ 41. At the January 22, 2018, meeting, Philbert met with Forbes, Jimenez, and the union chapter leader, "Diaz," who all took notes. *Id.* Philbert was asked about her absences and why she left early on November 14, 2017. *Id.* Philbert was told she was permanently reassigned to a middle school classroom on the third floor, although Forbes did not give a "legitimate reason" for such decision. *Id.* ¶¶ 38, 41. This change "effectively made" Philbert a middle school teacher, even though her license was in elementary education. *Id.* ¶ 38. The SAC alleges that similarly situated teachers without disabilities "were not compelled to such conduct." *Id.*

Also on or about January 22, 2018, Forbes refused to grant Philbert permission to attend professional development courses that other teachers were allowed to attend. *Id.* ¶ 39. Philbert

was also the only teacher who was not evaluated during the 2017–2018 school year.  *Id.* ¶ 40.  In or about April 2018, Philbert began seeking counseling to address her depression.  *Id.* ¶ 42.

### 4.     2018–2019: Discrimination and Harassment at PS 194

The SAC alleges that, because of the discrimination and hostile work environment Philbert experienced at PS 206, in July 2018, Philbert transferred to PS 194, where, beginning September 2018, Harrison was her supervisor.  *Id.* ¶¶ 43–44.  In or around October 2018, Harrison became aware of Philbert's LODI and disabilities.  *Id.* ¶ 45.  At PS 194, Philbert experienced harassment from Harrison; the paraprofessional who worked in her classroom, "Ms. A"; and other colleagues, spanning several categories of mistreatment.

#### a.     *Philbert's union delegate service*

In October 2018, Harrison harassed Philbert by telling her that she could no longer continue to serve as a union delegate, on the grounds that the paraprofessional in Philbert's class was a delegate, and "there could not be two delegates from the same class."  *Id.* ¶ 47.  However, the SAC alleges that the year before, both delegates had been from the same classroom.  *Id.*

#### b.     *Air conditioning and classroom access*

In October 2018, Philbert requested, as an accommodation for her migraines, that the air conditioning in her classroom be turned on.  *Id.* ¶ 48.  On October 5, 2018, Philbert discussed her migraines with Harrison and asked for permission to use the air conditioner, and that Harrison speak with the paraprofessional, "Ms. A," who kept turning the air conditioning off.  Harrison denied Philbert's request and told Philbert she could not use the air conditioner until April 2019.  *Id.*

On April 4, 2019, Philbert asked to take her learning group to an empty classroom as an accommodation, which Harrison denied.  *Id.* ¶ 64.  Harrison also had modified the windows in Philbert's classroom to prevent the lower part from opening.  *Id.*

On June 17, 2019, Harrison had the power connected to the air conditioner in Philbert's classroom turned off, even though Harrison knew that Philbert's migraines were triggered by extreme temperatures and the room was poorly ventilated. *Id.* ¶ 70. This, the SAC alleges, was the result of an incident in which Ms. A told a student to challenge Philbert and turn off the air conditioner.[4] The student acted disrespectfully and mimicked Ms. A by "barricading himself in front of the power switch." Philbert told Harrison what happened, and Harrison responded, "I told you what would happen if another incident took place," meaning that the power would be turned off. *Id.* ¶ 71. Philbert again asked to take her learning group to an empty classroom, but was denied that accommodation. *Id.* ¶ 70.

On June 24, 2019, Philbert texted Harrison asking her to have the custodians restore power to the air conditioner; Harrison did not respond. *Id.* On the morning of June 25, 2019, Philbert emailed Harrison and vice principal Colleen Lewis, asking for the power to be restored. *Id.* It was restored by mid-morning that day. *Id.*

### c.   *Discipline and poor evaluations by Harrison and Lewis*

On or about October 31, 2018, Harrison continued to abuse and harass Philbert by issuing her a meritless disciplinary letter claiming that Philbert had "neglected her duties." *Id.* ¶ 49. This letter was an act of retaliation for Philbert's having raised concerns about an upcoming Halloween field trip. *Id.* When Philbert and Harrison met about the letter, Harrison falsely accused Philbert "of lacking integrity surrounding how and when a lesson plan concerning an observation was conducted." *Id.* This, the SAC alleges, revealed that Harrison was not looking out for Philbert's best interests. *Id.*

---

[4] The SAC describes this incident as occurring on June 17, 2020, SAC ¶ 71, but the Court assumes, as do defendants, that given the context, the events alleged took place on June 17, 2019, *see* Def. Mem. at 16 n.3.

In November 2018, Philbert had a conversation with Harrison and asked Harrison to hold a meeting with all classroom staff.  Harrison responded that Philbert would need to get the union district leader involved and told Philbert that "the results could lead to further action" against Philbert.  *Id.* ¶ 50.  On December 5, 2018, Philbert emailed Harrison asking her to set up that meeting.  *Id.*  The meeting that was held did not resolve any issues.  *Id.*

On January 30, 2019, Philbert met with Harrison, who allegedly falsely claimed that Philbert had "derelicted" her duties by failing to update a bulletin board and because of certain missing data.  Philbert's co-teacher, who is white, was not called to the meeting; nor were the paraprofessionals in the classroom.  *Id.* ¶ 58.  On or about February 12, 2019, Harrison issued Philbert another disciplinary letter concerning the missing data and met with her about the letter. *Id.* ¶ 59.  Philbert told Harrison that she had told her co-teacher, with urgency, to complete the missing data on more than one occasion.  *Id.*  The SAC alleges that similarly situated employees who were not disabled did not face discipline based on false allegations.  On February 26, 2019, Harrison reminded Philbert "that an 'open market' is an option," which Philbert took to mean that she should transfer to another school.  *Id.* ¶ 62.

On April 4, 2019, Harrison asked Philbert for a lesson plan for a lesson that Harrison and Lewis were observing.  *Id.* ¶ 65.  That day, Lewis observed one of Philbert's lessons.  Lewis later completed a formal write-up of a lesson of Philbert's co-teacher and not Philbert, even though Lewis had not observed the co-teacher.  *Id.*

On April 11, 2019, Harrison observed Philbert during a math period, even though Philbert's co-teacher was the lead for math and Philbert led reading and writing.  *Id.* ¶ 66. Harrison then "berated" Philbert in front of her students and colleagues, and issued her an "ineffective" rating, without a valid basis and for the purpose of discriminating against her.  *Id.*

9

Philbert's white co-teacher was not observed teaching subjects in which she did not take the lead. *Id.* The same day, Philbert wrote an email to Harrison "expressing her frustrations" about the alleged discrimination and hostile work environment. *Id.* ¶ 67. Harrison asked Philbert to meet with her and Lewis; she did so the next morning. *Id.* At that meeting, Harrison "attempted to gaslight" Philbert; denied that the observation was a "gotcha"; and did not acknowledge that she was hostile and, by yelling at Philbert, conveyed that she approved of the discrimination and hostility Philbert claimed to be encountering. *Id.*

On May 30, 2019, Lewis formally observed Philbert and poorly rated her, even though Harrison had approved the lesson plan and Philbert had executed it as described. *Id.* ¶ 69.

### d.   Parent meetings

On or about February 25, 2019, Harrison called Philbert and another Black teacher, "Ms. Bryant," to a meeting with an obstreperous and pugnacious parent. *Id.* ¶ 61. The child's teacher, who was white, was not at the meeting. *Id.* The stress of this meeting, which the SAC calls a "parent-led interrogation," caused Philbert to be hospitalized overnight with chest pains and a fever. *Id.* This jeopardized a surgery that Philbert had planned on March 5, 2019, for her migraines. *Id.*; *but see id.* ¶ 63 ("On or about March 5, 2019, [Philbert] . . . had surgery to help correct her chronic migraines.").[5] Ms. Bryant was later "accosted" outside of school, and filed a police report for harassment against the parent. *Id.* ¶ 61. Philbert also filed an online safety complaint with her union about the incident "and surrounding events." *Id.*

On April 25, 2019, Harrison again "allowed a parent to interrogate and threaten" Philbert, who filed a safety report with her union. *Id.* ¶ 68.

---

[5] Philbert's medical leave for this surgery lasted from March 5–27, 2019. SAC ¶ 63.

e.      *Harassment by "Ms. A"*

The SAC alleges that, during the 2018–2019 school year, a paraprofessional in Philbert's class, to whom the SAC refers as "Ms. A," subjected Philbert to a hostile work environment, by committing the following acts:

- "sitting and coloring";

- "checking her Instagram in view of students";

- "talking during testing and other periods of time requiring silence";

- "redirecting students contrary to [Philbert's] directives";

- "refusing to assist students with given ELA assignments";

- "threatening to file police reports against [Philbert] for assault," including on April 4, 2019, after Ms. A "barricaded herself" in front of the air conditioner and prevented Philbert from using it;

- "leaving the classroom and her assigned 1-to-1 while making veiled threats against [Philbert]," including saying "let me go before I go to jail";

- making derogatory and unwanted remarks about Philbert's age, clothes, and body;

- "demonstrating a lack of judgment";

- "directing students to act in defiance against" Philbert and challenge Philbert's authority;

- "directing students to go home and tell their parents [Philbert] assaulted them," including on April 4, 2019;

- "acting in a physically aggressive manner towards" Philbert;

- using sexually suggestive language and insensitive terms; and

11

- closing a window in the classroom that Philbert wanted open. *Id.* ¶¶ 51–53, 64.

Philbert made several complaints about Ms. A's conduct through "in-person contact, text messages, emails, and anecdotal notes."[6] *Id.* ¶ 54.

In or about November 2018, Philbert met with the union's borough representative, Zina Burton, and Ms. A.  At that meeting, Ms. A disparaged and harassed Philbert about her "age, weight, and physical characteristics," and said that Philbert needed "to get some." *Id.* ¶ 52. Other requests to meet with the administration and classroom staff were denied. *Id.* ¶ 55. Instead, in December 2018, Harrison "threatened" to put Philbert "in a self-contained class setting" with Ms. A on the second floor of the school after Philbert asked if she could use the empty classroom for her learning group. *Id.* ¶¶ 56–57.

On April 7, 2019, Philbert sent an email to Burton describing an incident on April 4, 2019, in which Ms. A physically prevented Philbert from using an air conditioner; said she would call the police and file assault charges against Philbert; and told a student to go home and tell their parents that Philbert had "put my hands on them." *Id.* ¶ 64.  Burton refused to help or remove Ms. A from Philbert's classroom.

### f.    *Other discriminatory treatment*

In or about February 2019, the school's payroll secretary, "Ms. Kennely," tried to stop Philbert from "claiming a large portion of her Teacher's Choice fund," even though Philbert had not had problems with this fund in her previous seven years of teaching. *Id.* ¶ 60.

---

[6] The SAC dates these as occurring on October 5, 2018; November 30, 2018; December 5, 2018; April 1, 4, 7, 11, and 29, 2019; May 1, 2019; and June 5, 6, 10, 17, 24, and 25, 2019.  SAC ¶ 54.

### 5.      Termination

On or about June 25, 2019, Harrison told Philbert she was being terminated.  *Id.* ¶ 72.

The SAC alleges that Philbert's performance reviews were always satisfactory, except in 2017–

2018, when she was denied an annual evaluation, and in 2018–2019.  Throughout, defendants

knew of Philbert's disabilities and the need for her medical leaves of absence.[7]  *Id.* ¶ 74.

### B.      Procedural History

On April 11, 2021, Philbert filed her original complaint.  Dkt. 1.  The next day, she filed

the first amended complaint.  Dkt. 4.  On July 21, 2021, the Court adopted the parties' proposed

briefing schedule and granted defendants' request to stay discovery pending resolution of their

anticipated motion to dismiss.  Dkt. 15.  On August 20, 2021, defendants moved to dismiss under

Rule 12(b)(6).  *See* Dkts. 16–18.  On September 24, 2021, the Court granted Philbert's *nunc pro*

*tunc* request for an extension of her time to file the SAC, from September 10, 2021 to October 8,

2021.  Dkt. 20.

On October 8, 2021, Philbert filed the SAC.  Dkt. 22.  It brings claims against the City

and DOE for failure to accommodate, retaliation, and hostile work environment in violation of

the ADA; against all defendants, for discrimination, retaliation, and hostile work environment in

violation of the NYSHRL and NYCHRL; against all defendants, for intentional infliction of

emotional distress and negligent infliction of emotional distress; and, against DOE, for breach of

contract.  The Court also construes it to bring Title VII claims.  *See id.* ¶ 6 ("Plaintiff has

complied with all statutory prerequisites to her Title VII claims[.]"); Def. Mem. at 1 (stating that

---

[7] The SAC alleges that Philbert emailed Forbes and Harrison about LODI Leave and Restoration
of Health Leave on several dates, including as to Forbes, August 21, 2017, September 5, 2017,
October 8, 2017, October 20, 2017, November 17, 2017, November 19, 2017 and December 15,
2017, and as to Harrison, October 10, 2018, December 3, 2018, February 24, 2019, March 4,
2019 and June 25, 2019.  SAC ¶ 74.

Philbert's claims include Title VII claims of disability discrimination, hostile work environment, and retaliation).

On October 29, 2021, defendants filed the instant motion to dismiss, Dkt. 24, the declaration of Rachel M. DiBenedetto in support, Dkt. 25 ("DiBenedetto Decl."), attaching Philbert's New York State Division of Human Rights ("SDHR") complaint, Dkt. 25-1 ("SDHR Compl."), filed December 24, 2019, and the SDHR's determination in the form of a finding of no probable cause, issued on October 30, 2020, Dkt. 25-2 ("SDHR Op."), and a memorandum of law in support, Dkt. 26 ("Def. Mem.").  On November 11, 2021, Philbert filed a memorandum of law in opposition.  Dkt. 27 ("Pl. Opp'n").  On November 19, 2021, defendants filed a reply.  Dkt. 29 ("Def. Reply").

## II.      Applicable Legal Standards

### A.      Motions to Dismiss under Rule 12(b)(1)

To survive a motion to dismiss for lack of subject matter jurisdiction, "[a] plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that jurisdiction exists." *Giammatteo v. Newton*, 452 F. App'x 24, 27 (2d Cir. 2011) (summary order) (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000); *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996)).  In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff," *Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006), but "[j]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it," *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003) (quoting *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)).  *See also Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011); *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir.

2008), *aff'd on other grounds*, 561 U.S. 247 (2010).  A district court may consider evidence outside the pleadings, such as affidavits and exhibits.  *See Makarova*, 201 F.3d at 113.

### B.      Motions to Dismiss under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  By contrast, a complaint will not "suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks and alterations omitted).  Such factual enhancement is necessary to "nudge[] [a] claim[] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Although this standard "does not impose a probability requirement at the pleading stage," it does require a complaint to plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support plaintiff's claims.  *Id.* at 556.  Where a complaint fails to do so, "this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the [C]ourt." *Id.* at 558 (ellipsis omitted) (quoting 5 Wright & Miller, Federal Practice and Procedure § 1216).  Otherwise, "the threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching those proceedings." *Id.* at 559.

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the [Court] to draw on its judicial experience and common sense.  But where the well-pled facts do not permit inferring more than the mere possibility of misconduct, the complaint has not shown an entitlement to relief and must be dismissed." *Iqbal*, 556 U.S. at 679 (cleaned up).  Although the Court must accept as true all well-pled factual

allegations and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

## III.   Discussion

The Court addresses, in sequence, defendants' arguments that (1) the doctrine of election of remedies bars the SAC's state law claims, (2) some of its federal claims are untimely, and (3) the timely claims are deficiently pled.  The Court holds that the SAC's state law claims are barred, that its federal law claims arising before February 21, 2019 are untimely, and that of the remaining federal claims, only the SAC's ADA retaliation claim is well-pled.

### A.  The State and City Law Claims

Defendants argue that the SAC's NYSHRL, NYCHRL, and common law claims are barred by the "election of remedies" provisions in those two statutes.  Those provide that a person who files a complaint with either the SDHR or the New York City Commission on Human Rights (the "Commission") thereby waives his or her right to sue in court.  Philbert counters that some of her claims survive, because her SDHR complaint did not include claims against the individual defendants or certain state law claims.  Defendants are correct.

### 1.      Applicable Law

The NYSHRL provides, in pertinent part:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction . . . unless such person had filed a complaint hereunder or with any local commission on human rights  . . . provided that, where the division has dismissed such complaint on the grounds of administrative convenience, on the grounds of untimeliness, or on the grounds that the election of remedies is annulled, such person shall maintain all rights to bring suit as if no complaint had been filed with the division.

New York Exec. Law § 297(9).  The NYCHRL similarly provides:

> Except as otherwise provided by law, any person claiming to be aggrieved by an unlawful discriminatory practice as defined in chapter one of this title or by an act of discriminatory harassment or violence as set forth in chapter six of this title shall have a cause of action in any court of competent jurisdiction . . . unless such person has filed a complaint with the city commission on human rights or with the state division of human rights with respect to such alleged unlawful discriminatory practice or act of discriminatory harassment or violence.

N.Y.C. Admin. Code § 8-502(a).  A lawsuit therefore must be dismissed if the complainant has lodged a complaint with either the SDHR or the Commission.[8]

Courts "interpret the scope of claims precluded by the election of remedies broadly," such that, for jurisdiction in court to survive, the plaintiff must allege "a different set of facts" from those alleged in her SDHR complaint.  *Jackson v. N.Y. State Dep't of Labor*, 709 F. Supp. 2d 218, 225 n.3 (S.D.N.Y. 2010).  Thus, the bar applies as long as "substantially the same facts are involved"; the facts "need not be perfectly identical, and merely adding some additional facts and/or re-labeling the claim will not prevent the application of the doctrine of election of remedies."  *DeBerry v. Brookdale Univ. Hosp. & Med. Ctr.*, 11 F. Supp. 3d 387, 392 (E.D.N.Y. 2014) (quoting *Benjamin v. New York City Dep't of Health*, 851 N.Y.S.2d 68 (N.Y. Sup. Ct. Oct. 23, 2007), *aff'd*, 870 N.Y.S.2d 290 (1st Dep't 2008)).

The election of remedies bar equally applies in federal as state court.  *See York v. Ass'n of the Bar of City of N.Y.*, 286 F.3d 122, 127 (2d Cir. 2002); *see also McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 74 n.3 (2d Cir. 2010) ("[A] state law depriving its courts of jurisdiction over a state law claim also operates to divest a federal court of jurisdiction to decide the claim.")

---

[8] Two exceptions exist.  *See York v. Ass'n of Bar of City of N.Y.*, 286 F.3d 122, 127 n.2 (2d Cir. 2002) (exceptions to election of remedies bar exist where claims "were dismissed pursuant to administrative convenience" by SDHR or where "a charge is filed first with the EEOC, which then files it by automatic referral" to SDHR); *Williams v. City of New York*, 916 F. Supp. 2d 517, 522–23 (S.D.N.Y. 2013) (neither exception applies where SHDR complaint dismissed on merits and complaint was filed with SDHR directly).  This case triggers neither, because Philbert filed with the SDHR, which dismissed her complaint on the merits.  *See* SDHR Compl.; SDHR Op.

(alteration in original) (internal citation and quotation marks omitted).  The bar is jurisdictional, such that claims subject to it must be dismissed under Rule 12(b)(1), not Rule 12(b)(6).  *Moodie v. Fed. Rsrv. Bank*, 58 F.3d 879, 882 (2d Cir. 1995); *see also Skalafuris v. City of New York, Dep't of Corr.*, 437 F. App'x 54, 54–55 (2d Cir. 2011) (summary order).

### 2.    Analysis

Philbert argues that her claims against individual defendants Forbes and Harrison, and certain of her state law claims, survive because her SDHR complaint did not include claims against Forbes and Harrison or state law claims for hostile work environment; intentional infliction of emotional distress; negligent infliction of emotional distress; or breach of contract. That argument fails, because the election of remedies bar precludes any state-law claim arising under the same fact pattern even if the claim as formulated in court reaches other defendants or has a different statutory or common law basis.

Here, Philbert's SDHR complaint, filed December 24, 2019, made largely the same, and at points verbatim, factual claims as the SAC.  For example, it alleges that (1) on or about April 7, 2017, Philbert was assaulted by a student and injured her hand and that she filed a claim and underwent therapy and surgery for her hand, SDHR Compl. at 9, (2) Jimenez moved furniture in her classroom, causing Philbert to complain to Forbes about the conduct, *id.* at 10, and (3) Philbert suffers from a disability, migraines, and was discriminated against by Forbes and Harrison because of it, *id.* at 10–11.  It highlights a number of incidents central to the SAC, including Philbert's inability to continue serving as a union delegate and (nearly verbatim) Philbert's interactions with Ms. A, and it relates in similar terms the SAC's allegations about the meetings with parents, the deprivation of air conditioning, and the Teacher's Choice fund.  *Id.* at 11–12.

That, in the SAC, Philbert added claims against the individual defendants, and formulated her complaint to articulate state-law claims not specified before the SDHR does not salvage these parts of the SAC.  It is well-established—and Philbert does not cite any contrary case law, *see* Pl. Opp'n at 13—that under the election-of-remedies doctrine, courts lack jurisdiction over *all* state and local law claims arising out of the facts alleged in the administrative complaint.  Thus, "[a] claimant cannot avoid the jurisdictional bar by merely adding additional elements of damage arising out of the same underlying conduct or by changing [her] legal theory."  *Williams v. City of New York*, 916 F. Supp. 2d 517, 522 (S.D.N.Y. 2013) (cleaned up) (quoting *Rosario v. New York City Dep't of Educ.*, No. 10 Civ. 6160 (DLC), 2011 WL 1465763, at *2 (S.D.N.Y. Apr. 15, 2011)); *see also Saunders v. New York City Dep't of Educ.*, No. 07 Civ. 2725, 2010 WL 2816321, at *8 (E.D.N.Y. July 15, 2010) (election of remedies doctrine "not limited to the precise claims brought in the administrative proceeding, but extends to all claims arising out of the same events") (quoting *Wiercinski v. Mangia 57, Inc.*, No. 09 Civ. 4413, 2010 WL 2681168, at *2 (E.D.N.Y. July 2, 2010)).  Similarly, "[a] different pled form of relief arising out of the same incident[s] forming the basis of the claims" is still barred by the election of remedies doctrine.  *Black v. Anheuser-Busch in Bev*, No. 14 Civ. 2693 (RWS), 2016 WL 3866583, at *5 (S.D.N.Y. July 13, 2016) (citing *Borum v. Vill. of Hempstead*, 590 F. Supp. 2d 376, 383 (E.D.N.Y. 2008)).

Here, Philbert's claims against the individual defendants arise squarely from the incidents she detailed in her SDHR complaint, which indeed names these individuals.  *See* SDHR Compl. at 9–12.  So do all of her state and city law claims.  Accordingly, that Philbert did not delineate her state and local law claims before the SDHR with the same precision as she does now in the SAC does not salvage these claims.  *See Carroll v. U.P.S.*, 225 F.3d 645 (2d Cir. 2000)

(summary order) ("Because Carroll's two sets of claims arise out of the same group of facts, the matter before this court is jurisdictionally barred."); *Grays v. SDH Educ. W., LLC*, No. 16 Civ. 666 (DAB), 2017 WL 2240227, at *5 (S.D.N.Y. Mar. 23, 2017) (although plaintiff did not allege age discrimination in administrative complaint, the allegations "involve the same operative events" and are barred); *Dunn v. URS Corp.*, No. 13 Civ. 6626 (ALC) (HBP), 2015 WL 220990, at *4 (S.D.N.Y. Jan. 12, 2015) (although plaintiff did not bring two claims before SDHR, they could not be heard because "the election-of-remedies bar is not limited to the precise claims brought in the administrative proceeding, but extends to all claims arising out of the same events") (quoting *Coppedge v. N.Y.C. Sales Inc.*, No. 10 Civ. 6349 (BSJ) (JLC), 2011 WL 4343268, at *2 (S.D.N.Y. Sept. 8, 2011)).

Nor does the fact that Philbert here added the named individual defendants allow her to evade such bar. *Buckley v. New York*, No. 11 Civ. 5512, 2012 WL 13055736, at *15 (E.D.N.Y. Sept. 29, 2012) ("While the Plaintiff names additional defendants in the complaint before this Court, because the incidents are identical, this Court lacks jurisdiction over the Plaintiff's state law claims against all the Defendants.") (collecting cases); *Wiercinski*, 2010 WL 2681168 at *3 (stating that "[i]t is irrelevant that Wiercinski's complaint before the NYSDHR named only [a corporate defendant] as respondent, while his complaint here additionally names several individual defendants" because claims were "substantially identical").[9]

---

[9] This doctrine can bar both state common law and state statutory claims. *See, e.g., Buckley*, 2012 WL 13055736, at *16 (dismissing statutory claims as well as, *inter alia*, breach of contract, tortious interference, negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress claims because "the Court is barred from considering any of the Plaintiff's State law claims" under the election of remedies doctrine); *Horowitz v. Aetna Life Ins.*, 539 N.Y.S.2d 50, 52 (N.Y. App. Div. 1989) (holding that New York State Supreme Court "lacked jurisdiction over the plaintiff's cause of action to recover damages for the intentional infliction of emotional distress" because plaintiff attempted to recover for the same injuries

The Court accordingly grants the motion to dismiss the SAC's claims under the NYSHRL, the NYCHRL, and under state common law.[10]

### B.  Philbert's Federal Law Claims

#### 1.    Time-Barred Claims Under Title VII and the ADA

Defendants argue that, to the extent Philbert's federal law claims are based on conduct before February 27, 2019—300 days before Philbert filed her complaint with the SDHR—they are time-barred.  Def. Mem. at 9.  Philbert counters that the continuing violation doctrine rescues claims these claims, and that claims dating back at least to 2017 are timely.  Pl. Opp'n at 7–8. On this issue, defendants are substantially correct, save that the relevant date for measuring the time bar is the date of Philbert's filing with the EEOC, which occurred on December 18, 2019, six days before her filing with the SDHR.

#### a.    Applicable Law

"To pursue a claim under Title VII or the ADA in federal court in New York, the individual alleging discrimination must first assert those claims with the EEOC or the equivalent

---

before the SDHR "under . . . slightly different labels"); *cf. Williams v. Yellow Freight Sys., Inc.*, No. 93 Civ. 5491 (KMW), 1994 WL 18520, at *4 (S.D.N.Y. Jan. 18, 1994) (declining to sanction plaintiff who made state common law claims in court following an SDHR complaint because the election of remedies "does not necessarily preclude other state law claims" if they are "distinguishable" from SDHR claims).  The doctrine does not, however, affect federal law claims.  *See, e.g.*, *Bembry v. Darrow*, 7 F. App'x 33, 37 (2d Cir. 2001) (summary order) (affirming grant of summary judgment on federal claims and holding that district court lacked subject matter jurisdiction over state claim because plaintiff had filed SDHR complaint); *Jones v. New York City Dep't of Educ.*, 286 F. Supp. 3d 442, 446 (E.D.N.Y. 2018) (noting the "odd dichotomy between state and federal claims," in that federal claims must be brought before the EEOC before a suit is filed, whereas for state claims, bringing an SDHR claim bars suit).

[10] In light of this ruling, the Court has no occasion to consider defendants' separate arguments that Philbert may not bring certain state law damages claims against DOE because she failed first to file a notice of claim for her retaliation, intentional infliction of emotional distress, negligent infliction of emotional distress, and breach of contract claims, that she is time-barred from bringing claims past the one-year statute of limitations, and that her claims are barred by res judicata and collateral estoppel.  *See* Def. Mem. at 13–14.

state agency within 300 days of the allegedly discriminatory action." *Li-Lan Tsai v. Rockefeller Univ.*, 46 F. App'x 657, 658 (2d Cir. 2002) (summary order) (citing 42 U.S.C. § 2000e-5(e); 42 U.S.C. § 12117(a); *Harris v. City of New York*, 186 F.3d 243, 247–48 (2d Cir. 1999)). "This statutory requirement is analogous to a statute of limitations." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996) (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)). "Thus, only events that occurred during the 300-day period prior to filing" are actionable. *Id.*; *see also Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 325 (2d Cir. 1999); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109–10 (2002).

There is an exception to this statute of limitations for continuing violations. Under Title VII, "[w]hen a plaintiff experiences a continuous practice and policy of discrimination, the commencement of the statute of limitations may be delayed until the last discriminatory act in furtherance of it." *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994) (cleaned up). The ADA similarly enables a plaintiff to avoid the statute of limitations where she can establish a continuing violation. To do so, at the pleading stage, "a plaintiff must allege 'a series of separate acts, some of which occur within the applicable statute of limitations, that collectively constitute one unlawful act.'" *Am. Council of Blind of New York, Inc. v. City of New York*, 495 F. Supp. 3d 211, 245 (S.D.N.Y. 2020) (quoting *Forsee v. Metro. Transp. Auth.*, No. 19 Civ. 4406 (ER), 2020 WL 1547468, at *10 (S.D.N.Y. Mar. 31, 2020)).

However, that doctrine does not apply to—and recovery is unavailable for—"discrete acts of discrimination or retaliation that occur outside the statutory time period." *Morgan*, 536 U.S. at 105. Acts of this nature include "termination, failure to promote, denial of transfer, or refusal to hire." *Id.* at 114. Justice Ginsburg explained the rationale for not treating such acts as timely under the continuing violations doctrine:

> A worker knows immediately if she is denied a promotion or transfer, if she is fired or refused employment.  And promotions, transfers, hirings, and firings are generally public events, known to co-workers.  When an employer makes a decision of such open and definitive character, an employee can immediately seek out an explanation and evaluate it for pretext.

*Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 649 (2007) (Ginsburg, J., dissenting).

### b.      Analysis

Philbert filed her EEOC charge on December 18, 2019, SAC ¶ 7, and her SDHR charge on December 24, 2019, *see* SDHR Compl. at 9; Def. Mem. at 7, 9, 11.  Defendants, citing the date of her SDHR charge, claim that any conduct preceding February 27, 2019 is untimely.  However, because federal claims require a charge filed with *either* the EEOC or the SDHR, Philbert's EEOC filing date is decisive here.  The question is thus whether claims based on conduct that occurred more than 300 days before that filing—*i.e.*, before February 21, 2019—are time-barred, in whole or part.

The SAC alleges several incidents occurring before February 21, 2019.  These include: (1) in or about November 2014, Philbert's request to PS 206 for accommodations; (2) denials by DOE of claims for LODI in the aftermath of the 2017 assault; (3) in 2017, Jimenez's moving the furniture in Philibert's classroom; (4) in November 2017, Philbert's meeting with Forbes and Jimenez about her classroom, the furniture, and ensuing complaint to a union representative; (5) between November 2017 and January 2018, Forbes's changing the locks on Philbert's classroom and requiring Philbert to cover for other teachers; (6) in November 2017 and January 2018, Philbert's being threatened with disciplinary action; (7) in January 2018, Philbert's reassignment to a middle school classroom; (8) in January 2018, Philbert's being denied permission to attend professional development courses; (9) in the 2017–2018 school year, the lack of an evaluation of Philbert; (10) in October 2018, Harrison's telling Philbert that she could no longer be a union delegate; (11) in October 2018, Philbert's request for air conditioning as an accommodation for

her migraines, which was denied; (12) in October 2018, Harrison's discipline of Philbert for raising concerns about the Halloween field trip; (13) in November 2018, Harrison's refusal to hold a meeting with classroom staff; (14) in November 2018, Ms. A's disparagement of Philbert; (15) in December 2018, Harrison's threat to put Philbert in a self-contained classroom with Ms. A; (16) in January and early February 2019, Harrison's discipline of Philbert about missing data on a bulletin board; and (17) in or about February 2019, Ms. Kennely's attempt to prevent Philbert from claiming her Teacher's Choice fund.

At the threshold, Philbert, in opposing defendants' motion to dismiss, does not argue that any conduct before 2017 may timely be challenged.  Her argument that the continuing violations doctrine applies is limited to conduct in or after 2017.  *See* Pl. Opp'n at 7–8 (arguing that SAC alleges continuous violations "over a three-year period from 2017 to 2019").  The Court thus treats Philbert as foregoing any argument that claims based on pre-2017 conduct are timely under any legal theory.  *See Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("[A] court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); *Anti-Monopoly, Inc. v. Hasbro, Inc*., 958 F. Supp. 895, 907 n.11 (S.D.N.Y.) ("[T]he failure to provide argument on a point at issue constitutes abandonment of the issue . . . which provides an independent basis for dismissal."), *aff'd*, 130 F.3d 1101 (2d Cir. 1997).

As to conduct between 2017 and February 21, 2019, the SAC does not plead facts making the continuing violations doctrine applicable to these acts, which, viewed on their own terms, are undisputedly outside the limitations period.   Each of these disparate acts, as pled, is "discrete," rather than demarking a continuous policy of discrimination.  Reliance on some is separately problematic, because, as pled, they do not indicate discrimination.  Finally, that these

acts reflect conduct by numerous different perpetrators spanning two public schools further

undermines Philbert's claim of a continuous violation.

i.      Discrete acts

Several acts pled in the SAC are of such a definitive character that, even in conjunction

with other acts, they cannot collectively qualify as a continuing violation.  These include DOE's

denial of Philbert's claims and leave arising from her 2017 assault; Forbes's changing the locks

on Philbert's classroom and requirement that she cover for other teachers; Philbert's

reassignment to other classrooms; and various discrete impositions of discipline on Philbert.

SAC ¶¶ 26, 29, 35, 38, 41, 46, 49.  As to each, Philbert necessarily knew of the act when it

occurred and could therefore "immediately seek out an explanation."  *Ledbetter*, 550 U.S. at 649

(Ginsburg, J., dissenting).  Indeed, in a number of instances, Philbert did exactly that—taking

responsive action—whether by complaining to and meeting with Forbes, SAC ¶¶ 31, 34,

complaining to a union representative, *id.* ¶¶ 34, 41, or seeking a meeting with classroom staff

and discussing her issues with Harrison, *id.* ¶ 50.  Such acts cannot be the basis for finding a

continuing violation.  *See, e.g.*, *Hadid v. City of New York*, 730 F. App'x 68, 72–73 (2d Cir.

2018) (summary order) (district court "did not err in identifying Hadid's reassignment and

internal discipline as discrete acts to which the continuing violation doctrine could not apply");

*see also Washington v. Cnty. of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004) (filing of

disciplinary charges against plaintiff correctional officers cannot toll statute of limitations under

continuing violation doctrine).  Philbert knew of these acts when they occurred and not only

could, but in many instances promptly did, seek redress.

The alleged failures to meet Philbert's requests for accommodation arising out of the

incidents involving the furniture and air conditioning in her classroom also do not qualify as

continuing violations.  As to the furniture, the SAC alleges that on at least three occasions—

sometime between October 1 and 8, 2017; November 3, 2017; and November 14, 2017—
Jimenez "move[d] the furniture in [Philbert's] classroom without [Philbert's] permission and for
no legitimate reason." *See* SAC ¶¶ 30–31.  The SAC alleges that because of Philbert's
disabilities, she "could not move the furniture back where it belonged" alone, and had to ask
colleagues for help.  *Id.* ¶ 30.  Philbert allegedly explained to Forbes that she needed her
classroom structured a certain way in order to "accommodate the injuries to her hand," and that
the moving of the furniture "could impede her hand recovery."  *Id.* ¶ 31.  As to the air
conditioning access, in October 2018, the SAC alleges that Philbert requested air conditioning
for her migraines, a request Harrison denied, stating that the air conditioning could not be used
until April 2019.  *Id.* ¶ 48.

       These do not suffice to show a continuing violation.  Even assuming *arguendo* that, as
pled, these episodes make out a *prima facie* case of discrimination, claims under the ADA of a
failure to accommodate are quintessential discrete acts.  *Gomez v. New York City Police Dep't*,
191 F. Supp. 3d 293, 302 (S.D.N.Y. 2016).  This doctrine derives from the Second Circuit's
caselaw on requests for religious accommodation.  The Circuit has held that "an employer's
rejection of an employee's proposed accommodation for religious practices does not give rise to
a continuing violation" because "[t]he rejection of a proposed accommodation is a single
completed action when taken," even if its effects continue thereafter to be felt.  *Elmenayer v.
ABF Freight Sys., Inc.*, 318 F.3d 130, 134–35 (2d Cir. 2003).  District courts in this Circuit "have
regularly applied *Elmenayer* to failure to accommodate claims under the ADA."  *Gomez*, 191 F.
Supp. 3d at 302 (collecting cases); *see also Francis v. Wyckoff Heights Med. Ctr.*, 177 F. Supp.
3d 754, 776 (E.D.N.Y. 2016) ("[An] employer's denial of a requested accommodation does not
give rise to a 'continuing violation,' but is a discrete employment action that requires the plaintiff

to file a charge with the EEOC within 300 days of the denial.").  Therefore, "[d]iscrete acts of this sort, which fall outside the limitations period, cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period."  *See Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 157 (2d Cir. 2012). The sequential denials of Philbert's requests for use of air conditioning. *see* SAC ¶¶ 48, 64, 70, 71, thus do not make a continuing violation so as to enable acts outside the limitations period to be a basis for liability.

ii.     Lack of discriminatory policy or practice

A continuing violation necessarily entails an "ongoing *discriminatory* policy or practice." *Van Zant*, 80 F.3d at 713 (emphasis added).  Yet many of the acts Philbert alleges, as pled, lack any nexus to either her disability or her race.  As to these acts, that deficiency separately undermines Philbert's bid to invoke the continuing violations doctrine.

As to some of these acts, the SAC explicitly contrasts Philbert's treatment to that of the teachers as a whole at the school in question.  *See, e.g.*, SAC ¶ 39 (alleging that Forbes would not let Philbert attend professional development courses "that other teachers were allowed to attend"); *id.* ¶ 40 (Philbert "was the only teacher not evaluated during the 2017–2018 school year").  But, critically, the SAC does not recite facts that plausibly attribute this negative treatment of Philbert to a protected characteristic of hers.  In other instances, the SAC alleges undesirable or unfavorable treatment of Philbert—and, implicitly, of only Philbert—but again, does not allege facts that attribute these slights to her disability or race.  *See, e.g.*, *id.* ¶ 41 (alleging conduct described as harassment, but without alleging the conclusion—or facts supporting the conclusion—that such conduct was based on protected characteristic); *id.* ¶ 47 (alleging that Philbert was told she could not be a union delegate, but not attributing this to any protected characteristic).  In other instances, the SAC attributes mistreatment of Philbert to

27

characteristics or activities of hers outside the protection of federal law.  *See, e.g.*, *id.* ¶ 49

(alleging "abusive behavior and harassment" of Philbert by Harrison prompted by Philbert's

"raising concerns" about upcoming field trip).

The SAC makes specific allegations about Philbert's interactions with Ms. A before and

after February 21, 2019.  But although claims based on such actions post-dating that date are not

time-barred, none of the general allegations about Ms. A's attitudes and conduct towards

Philbert, whether before or after February 21, 2019, invokes Philbert's protected characteristics.

*Id.* ¶ 51.[11]  Therefore, even if the conduct described was by nature capable of forming the basis

of a continuing practice, the factual allegations about Ms. A's negative treatment of Philbert

could not support a continuing *violation*, because the facts do not plausibly support an inference

of discriminatory motivation and hence a violation of law.  *See Erasmus v. Deutsche Bank*

*Americas Holding Corp.*, No. 15 Civ. 1398 (PAE), 2015 WL 7736554, at *9 (S.D.N.Y. Nov. 30,

2015) (dismissing discrimination claim where complaint "nowhere suggest[ed] that the

defendants engaged in such actions *because* of Erasmus's membership in a protected class")

(emphasis in original); *Humphries v. City Univ. of N.Y.*, No. 13 Civ. 2641 (PAE), 2013 WL

6196561, at *6 (S.D.N.Y. Nov. 26, 2013) (same, where plaintiff failed "'to plead any facts that

---

[11] As to Ms. A's year-long conduct, the SAC's allegations are generalized and largely highly
conclusory.  It broadly alleges that, "[t]hroughout the 2018–2019 school year," Ms. A "acted in
an unprofessional manner and subjected [Philbert] to a hostile work environment by; (1) sitting
and coloring; (2) checking her Instagram in view of students; (3) talking during testing and other
periods of time requiring silence; (4) redirecting students contrary to [Philbert's] directives; (5)
refusing to assist students with given ELA assignments; (6) threatening to file police reports
against [Philbert] for assault; (7) leaving the classroom and her assigned 1-to-1 while making
veiled threats against [Philbert] i.e. saying 'let me go before I go to jail'; (8) making derogatory
remarks about [Philbert's] age, clothes, and body; (9) demonstrating a lack of judgment; (10)
directing students to act in defiance against [Philbert]; (11) directing students to go home and tell
their parents [Philbert] assaulted them; and (12) acting in a physically aggressive manner
towards [Philbert]."  SAC ¶ 51.

would create an inference that any adverse action taken by any defendant was based upon' the protected characteristic") (quoting *Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007)).

In discrete instances, the SAC makes a conclusory allegation to the effect that an action was discriminatory. *See, e.g.*, SAC ¶ 60 (Philbert "faced discriminatory treatment by the payroll secretary, Ms. Kennely, who attempted to prohibit [her] from claiming a large portion of her Teacher's Choice fund"). But without supportive factual allegations, conclusory claims of invidious intent do not viably so plead. *See Valtchev v. City of New York*, 400 F. App'x 586, 589 (2d Cir. 2010) (summary order) ("Although Valtchev also accuses defendants of . . . 'practicing age discrimination on a wide scale,' this type of conclusory allegation is not sufficient to raise an issue of a 'specific' discriminatory policy."). These allegations, too, cannot be marshaled as support for a claim of a continuing violation.

### iii.    Multiple perpetrators

A final difficulty with Philbert's theory that the continuing violation doctrine enables her to seek relief for conduct before February 21, 2019 is that her allegations for the period 2017 through that date entail a broad swath of ostensible malefactors. These include acts by officials at two different schools; by DOE for denying her requests for accommodation and relief; by Jimenez for moving her furniture; by Forbes, Harrison, and Ms. A for various acts; and by Ms. Kennely for attempting to deny her access to funds. These variegated slights by multiple persons at different times and involving different schools conflict with the requirement that the continuing violation be of common character. That is because, as the Second Circuit has explained, a "lack of overlap between alleged harassers also points against finding a continuing violation." *Purcell v. New York Inst. Of Tech.-Coll. of Osteopathic Med.*, 931 F.3d 59, 65 (2d Cir. 2019). For this reason, too, Philbert cannot salvage claims based on conduct before February 21, 2019 based on the continuing violation doctrine.

For all the above reasons, Philbert's claims—under Title VII and the ADA—based on conduct before February 21, 2019 are untimely.

### 2. Title VII Claims

The Court next considers defendants' motion to dismiss the SAC's claims under Title VII. Defendants note that the SAC overwhelmingly concerns alleged discrimination based on Philbert's disabilities, but that Title VII, unlike the ADA, does not reach discrimination on that basis. Def. Mem. at 18–19 (citing *Risco v. McHugh*, 868 F. Supp. 2d 75, 107 (S.D.N.Y. 2012) ("Title VII does not prohibit discrimination on the basis of disability.")).

Title VII does reach racial discrimination, but the SAC makes only tangential references to race, generally by identifying the race of Philbert's colleagues. *See* SAC ¶¶ 58 (Philbert's white co-teacher not called to meeting with Harrison); 61 (white teacher not called to meeting with parent, Harrison, Philbert, and another Black teacher, Ms. Bryant); 66 (Philbert's white co-teacher not observed outside of the subject she taught). The apparent implication of these stray references is that Philbert would have been treated differently had she not been Black. These limited factual averments do not plausibly give rise to the inference that the actions or decisions described were motivated by race, let alone that adverse action was taken against Philbert on account of her race. *See, e.g.*, *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 328–29 (S.D.N.Y. 2020) (amended complaint failed to allege plausible claim of termination on account of race); *Erasmus*, 2015 WL 7736554, at *9; *Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 408–09 (S.D.N.Y. 2014) (dismissing discrimination claim where complaint "lacks any factual basis from which one could infer . . . differential treatment" on account of race and any causal connection between allegedly racially discriminatory conduct and "conduct rising to the level of an adverse employment action"); *Humphries*, 2013 WL 6196561, at *8 (dismissing discrimination claims where "the Amended Complaint does not make any concrete factual

allegations on which the conclusion could plausibly be drawn that [the plaintiff] was treated differently from similarly situated" colleagues who were a different gender and race and only conclusorily links "alleged slights or indignities to Humphries' race or gender" because "[s]uch purely conclusory allegations of discrimination . . . fail to establish a *prima facie* case").  And in the end, Philbert, in her opposition, does not contest defendants' argument that dismissal is warranted of the SAC's Title VII claims, or argue in support of these claims.

The Court accordingly dismisses the SAC's Title VII claims.

### 3.    ADA Claims

The SAC alleges that defendants violated the ADA in three ways: by failing to accommodate her disabilities; creating a hostile work environment; and retaliating against her. The Court takes each in turn, after first addressing whether Philbert is disabled within the meaning of the ADA.

### a.    Is Philbert disabled within the meaning of the Act?

Under the ADA, a "disability" includes "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  *Id.* § 12102(2)(A).

The SAC alleges that Philbert's "chronic migraines . . . substantially limited numerous major life activities by often causing visual and speech impairments, difficulty hearing, difficulty sleeping, concentration issues, sensitivity to light, nausea, fatigue, and pains associated with throbbing and pulses" and that the injury to her hand also "substantially limited numerous major life activities, including negatively impacting her ability to grip, hold things and otherwise use her left hand."  SAC ¶ 77; *see also id.* ¶¶ 14, 21, 61.  The SAC does not elaborate.

31

The SAC's terse pleadings on this point leave open whether Philbert will be able to establish, at summary judgment or trial, a qualifying disability.  There is adverse case law on whether migraines, the disability as to which the SAC's timely claims pertain, qualify as such.  *See Woolf v. Strada*, 949 F.3d 89, 95 (2d Cir. 2020) (affirming grant of summary judgment to employer where employee with stress-induced migraines could not show that "his work-induced impairment substantially limited his ability to work in a class or broad range of jobs," rather than with his supervisors, such that "no reasonable factfinder could conclude that Woolf has a 'disability' within the meaning of the ADA"); *see also Allen v. SouthCrest Hosp.*, 455 F. App'x 827 (10th Cir. 2011) (migraine did not qualify as disability).  It will be necessary for Philbert to go beyond the general description above, and establish concrete facts particular to her migraine condition, to clear this hurdle.

Second, the SAC only formulaically recites major life activities impeded by Philbert's infirmities.  It does not set out with any detail about how Philbert's alleged disability substantially and actually affected any major life activity.  *See Zuckerman v. GW Acquisition LLC*, No. 20 Civ. 8742 (VEC), 2021 WL 4267815, at *11 (S.D.N.Y. Sept. 20, 2021) (in dismissing ADA claim, finding formulaic claims mimicking EEOC list and noting lack of factual allegations keyed to plaintiff); *see id.* ("[B]are and vague allegations that a plaintiff has trouble concentrating are insufficient to allege a substantial impairment of a major life activity.").  The SAC lists only the effects that migraines generically have, without alleging much about how they constrained Philbert.  A plaintiff-specific showing will be necessary because, as the EEOC regulations note, a cognizable disability limits an individual's ability to perform a major life activity "*as compared to most people* in the general population."  29 C.F.R. § 1630.2(j)(1)(ii) (emphasis added).

Nonetheless, the Court holds, narrowly, that the SAC's allegations as to the migraine condition satisfactorily plead a qualifying disability. That is because, although the SAC speaks in general terms and lacks important details about the effect on Philbert's major life activities and recites these activities only formulaically, it contains a key allegation: that Philbert's migraines were severe enough that she had surgery to treat them, with the surgery being substantial enough to require substantial time away from work during recovery. SAC ¶¶ 17–19, 61, 63. The Court views that allegation as, circumstantially, underscoring the gravity of Philbert's condition. The Court will accordingly not dismiss Philbert's ADA claims on that ground. It will, however, be necessary for Philbert, to survive summary judgment, to develop factually how her migraines substantially affected her major life activities.

### b.    *Failure to Accommodate*

To state a claim for an employer's failure to accommodate a disability, a plaintiff must adequately allege that: "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *McMillan v. City of New York*, 711 F.3d 120, 125–26 (2d Cir. 2013) (internal citation omitted). Defendants argue that the SAC fails to plead the third and fourth elements, respectively, as to the two requests for accommodation that fall within the limitations period: for Philbert to be allowed to use a then-empty classroom and to use air conditioning.[12] Defendants are correct.

---

[12] Defendants also argue that Philbert's request to have Ms. A removed from her classroom did not constitute a request for a *reasonable* accommodation. Def. Mem. at 17; *see* SAC ¶ 64. The Court does not view the SAC as alleging that this was a request under the ADA. But if the SAC meant to so allege, this pleading would indeed fail as a matter of law. *See Cannice v. Norwest Bank Iowa N.A.*, 189 F.3d 723, 728 (8th Cir. 1999) ("the obligation to make reasonable

First, the SAC alleges that, on April 4, 2019, Philbert asked Harrison if she could take her learning group to an empty classroom but "was denied this accommodation." SAC ¶ 64. This request was made because Ms. A would not let Philbert turn on the air conditioning; said she would call the police and file assault charges against Philbert; told a student to tell their parents that Philbert "put my hands on them"; and closed the window when Philbert tried to open it. *Id.* Harrison also had custodians modify the windows to prevent part of them from opening. *Id.* On June 17, 2019, the SAC alleges, Philbert again asked for an empty classroom after conflict with Ms. A and a student, "and was denied this accommodation." *Id.* ¶ 70.

Critically, the SAC nowhere pleads that Philbert needed the empty classroom as an accommodation for her disability. It instead casts this request as arising from her poor working relationship with Ms. A. The SAC does not plead that the empty classroom had air conditioning, or better ventilation. Instead, as pled, the purpose of relocating to an empty classroom was for Philbert to have her own space. *See id.* ¶ 57 (Philbert's alleged request of Harrison to use the empty classroom for her learning group as part of parallel teaching). Whether reasonable or not, such a request does not qualify as an accommodation within the ADA because, as pled, it was untethered to Philbert's disability. *See Buckley v. Consol. Edison Co. of New York, Inc.*, 155 F.3d 150, 156 (2d Cir. 1998) (ADA "does not require an employer to make accommodation for an impairment that is not a disability within the meaning of the Act or that does not result from

accommodation" does not "extend[] to providing an aggravation-free environment"); *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 579 (3d Cir. 1998) ("Gaul's request to be transferred away from individuals causing him prolonged and inordinate stress" is "unreasonable as a matter of law under the ADA" as an accommodation); *Grillasca-Pietri v. Portorican Am. Broad. Co.*, 233 F. Supp. 2d 258, 264 (D.P.R. 2002) ("preventing stress-producing situations at work is an unreasonable accommodation as a matter of law") (citing *Marino v. U.S. Postal Serv.*, 25 F.3d 1037 (1st Cir. 1994)).

such a disability"); *Felix v. New York City Transit Auth.*, 324 F.3d 102, 107 (2d Cir. 2003) (under ADA, "other impairments not caused by the disability need not be accommodated").

Second, as to the air conditioning, the SAC alleges that Harrison caused it to be turned off between June 17 and 25, 2019, "despite knowing that extreme temperatures trigger migraines" for Philbert.[13]  SAC ¶ 70.  This shutdown took place after Philbert had had a conflict with Ms. A and a student, and Harrison reminded Philbert that she would turn off the air conditioning if there were further conflict in her classroom.  *Id.* ¶ 71.  Critically, the SAC alleges, however, that Philbert asked Harrison to restore the power on June 24, 2019—one week after it was allegedly turned off—and that Harrison did so, the next day.  *Id.* ¶ 70.

An unreasonable delay in providing an accommodation may give rise to a viable claim for failure to accommodate.  *See Fol v. City of New York*, No. 01 Civ. 1115 (THK), 2003 WL 21556938, at *8 (S.D.N.Y. July 9, 2003).  But, on the facts pled, the delay was reasonable here. Cases have held that substantially longer periods between a request and its being met do not constitute unreasonable delay.  *See, e.g.*, *Lambert v. Trump Int'l Hotel & Tower*, 304 F. Supp. 3d 405, 422 (S.D.N.Y. 2018) (eight-day delay between plaintiff's written request for an accommodation and when this request reached plaintiff's supervisor not unreasonable); *see also Williams v. Geiger*, 447 F. Supp. 3d 68, 74–75, 83 (S.D.N.Y. 2020) (three-week gap between requesting accommodation and having it granted was reasonable).  Although the reasonableness of a delay turns on the particular facts and circumstances, the SAC does not allege any facts as to

---

[13] As discussed above, Philbert's claims based on the earlier denied requests for air conditioning, made between October 2018 and April 2019, SAC ¶ 48, are untimely.  The SAC implies that in between April 4, 2019—on which day Philbert was prevented for some time from using the air conditioner by Ms. A—the air conditioning was on thereafter until on or about June 17, 2019. *See id.* ¶¶ 64–70, 71 ("Ms. A . . . directed a student to . . . turn off the air conditioner").  And as discussed, each new denial of an accommodation is a new discrete act.

why the one-day delay here in granting her request for air conditioning was unreasonable.  The SAC therefore fails to state a failure to accommodate claim.

### c.    Hostile Work Environment

#### i.    Applicable law

A plaintiff may establish a *prima facie* case of hostile work environment by demonstrating that the discriminatory treatment at issue "was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015) (internal quotation marks omitted); *see Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019) (holding hostile work environment claim cognizable under ADA and applying Title VII standards).  A hostile work environment claim must be plausible by both objective and subjective measures.  "[T]he conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive."  *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)).  "It is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic."  *Tolbert*, 790 F.3d at 439 (citing *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)).

"In determining whether a plaintiff suffered a hostile work environment," a court "must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Love v. Premier Util. Servs., LLC*, 186 F. Supp. 3d 248, 253 (E.D.N.Y. 2016) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015)).  "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed

pervasive.'" *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (quoting *Alfano*, 294 F.3d at 374).

That said, on the pleadings, the Second Circuit has "cautioned against setting the bar too high" for such claims. *Id.*  To survive a motion to dismiss, a complaint must allege facts plausibly indicating that the plaintiff "was faced with 'harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" *Patane*, 508 F.3d at 113 (alterations in original) (quoting *Terry*, 336 F.3d at 148).

ii.     Analysis

The SAC fails to clear that bar.  It alleges the following actions within the limitations period that potentially bear on a hostile work environment claim: (1) on or about February 25, 2019, Philbert met with Harrison and an "irate and belligerent parent" which "caused undue stress" to Philbert, and on April 25, 2019, Harrison "allowed a parent to interrogate and threaten" Philbert, SAC ¶¶ 61, 68; (2) on April 4, 2019, Ms. A "barricaded herself in front of the air conditioner power switch" and said she would call the police and file assault charges against her, *id.* ¶ 64; (3) on or about April 11, 2019, Harrison "berated" Philbert in front of her students and colleagues following an observation, *id.* ¶ 66, which "supported the same culture of hostility," *id.* ¶ 67; (4) on or about May 30, 2019, Philbert was poorly rated by the assistant principal, *id.* ¶ 69; and (5) on or about June 17, 2019, Harrison had the electricity connected to the air conditioning in Philbert's classroom turned off, *id.* ¶ 70.  The SAC also makes (6) generalized allegations about Ms. A's conduct towards Philbert between 2018 and 2019, *id.* ¶ 51.

For two principal reasons, these scant allegations fall well short of pleading a hostile work environment based on disability.  They lack the pervasiveness required of such a claim. And, critically, they fail to plausibly allege that the unwelcome behavior described derived in any way from a disability of Philbert's.

37

As to pervasiveness, the SAC's allegations are gaunt.  It only alleges episodic moments of unpleasantness rather than the existence of a hostile work environment: two tense meetings with parents; Harrison berating Philbert on one occasion; a negative job evaluation; and the turning off the electricity once, only to have it turned back on within a day of Philbert's request to do so.  Such conduct, viewed as a whole, does not describe a workplace in which a reasonable employee would find the conditions of her employment altered for the worse.  Far from being pervasive, these disparate incidents occurred on several occasions spanning several months.  *See, e.g.*, *Murtha v. New York State Gaming Comm'n*, No. 17 Civ. 10040 (NSR), 2019 WL 4450687, at *13 (S.D.N.Y. Sept. 17, 2019) ("Plaintiff's claims with regard to the air conditioning [lack] severity or pervasiveness, occurring as they did on only a handful of occasions over the last summer of Plaintiff's employment.").  The acts alleged signify little more than the familiar but non-actionable stressors of the working world.  *See, e.g.*, *Trachtenberg v. Dep't of Educ. of City of New York*, 937 F. Supp. 2d 460, 472 (S.D.N.Y. 2013) (allegations that plaintiff "was subjected to excessive scrutiny; principal Rosen would 'frequently stand in the area and stare at [Trachtenberg] in an effort to intimidate [her]'; she received negative performance evaluations and letters from Rosen that contained 'scurrilous charges'; she was moved to a poorly ventilated, windowless office; and she was refused training opportunities" "fall well short" of allegations giving rise to a hostile work environment) (alterations in original).

To be sure, the Second Circuit has found that, in some circumstances, a single tirade may establish a hostile work environment claim, *see Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (woman firefighter subjected to sexually explicit and degrading barrage of insults in front of her subordinates who later spread rumors about her competence and disobeyed direct orders).  But no comparable tirade or extreme event is pled here.  The SAC does not allege the

content of Philbert's alleged beratement by Harrison or how it affected Philbert's authority in the classroom.  Harrison's castigation of Philbert, as pled, is insufficient to make out a hostile work environment.  *See Trachtenberg*, 937 F. Supp. 2d at 473.

Further, even assuming *arguendo* that these episodes were severe and pervasive, the SAC does not plead facts attributing defendant's conduct to Philbert's disability, as such a claim requires.  *See Dollinger v. New York State Ins. Fund*, 726 F. App'x 828, 831 (2d Cir. 2018) (summary order) (where only one harassing communication referred to disability, plaintiff failed to state a hostile work environment claim).  As noted earlier, in recounting the two episodes with the parents, the SAC gestures at the possibility of race discrimination, because two Black teachers were called to meet with the parent in the first instance, and a white teacher was not, SAC ¶ 61, and states that Harrison again "allowed a parent to interrogate and threaten" Philbert in the second instance, without any explicit or implicit statement that it had to do with Philbert's protected status, *id.* ¶ 68; *see also id.* ¶ 66.  But the SAC does not adequately plead—and Philbert has foresworn—Title VII claims based on her race, which the ADA does not cover.  *See* § III.B.2, *supra*.  And the SAC does not supply any basis to treat the tenor of the parent meetings as arising from her hostility to Philbert's physical condition.  Similarly, the SAC lacks allegations tying her negative performance evaluation to her condition.  SAC ¶ 69.

There is also, as pled, no basis to find that Harrison caused the air conditioning in Philbert's classroom to be turned off because of Philbert's disability—as opposed to for valid reasons or based on personal hostility unconnected to the asserted disability.  The SAC alleges that Harrison knew that "extreme temperatures trigger migraines" for Philbert and "had full awareness of the limited ventilation in the room."  *Id.* ¶ 70.  But it does not supply any basis to conclude that Harrison turned off the air conditioning as a means to discriminate against Philbert.

The SAC instead ties Harrison's decision to turn off the air conditioning to the recurrence of internal classroom conflict among teaching personnel.  It alleges that Harrison told Philbert that "she would turn off the power to air conditioning if there was more conflict" between Philbert and Ms. A.  *Id.* ¶ 71.  Whatever critiques may be directed to that mode of personnel management, the SAC does not tie this threat, or its execution, to Philbert's protected characteristic.  The SAC therefore fails to state a claim of hostile work environment.  *See Murtha*, 2019 WL 4450687, at *13 ("Even if the air conditioning incidents constituted severe and pervasive behavior, there are no facts in the FAC indicating that the supervisor who allegedly shut off the air conditioning did so with the intention of aggravating Plaintiff's asthma.").

Notably, these allegations are a far cry from those in cases finding viable such claims based on disability.  *See, e.g.*, *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 179 (4th Cir. 2001) (evidence that supervisors, "in vulgar and profane language, constantly berated and harassed [plaintiff] and the other disabled workers," at least weekly, including by calling them "handicapped MF" and "hospital people," thereby "expressly referenc[ing] their disabilities and resulting medical restrictions"; "encouraged other employees to ostracize the disabled workers and prevent them from doing their assigned tasks"; and exposed plaintiff to physical harm, including by requiring plaintiff "to perform tasks beyond his medical restrictions").  As the Second Circuit has noted, because "many bosses are harsh, unjust, and rude," hostile work environment claims must exclude "decisions that lack a linkage or correlation to the claimed ground of discrimination."  *Alfano*, 294 F.3d at 377.  The SAC lacks such here.

Nor do the general allegations about the conduct of the paraprofessional Ms. A—to the extent not time-barred—state anything resembling a hostile work environment claim.  These are

vague and conclusory, unsupported by factual detail.  Some fault Ms. A for conduct unbecoming a teaching professional, including "sitting and coloring," "checking her Instagram in view of students," and "acting in a physically aggressive manner towards Philbert."  SAC ¶ 51.  But these allegations—generally framed, unmoored in time, and unconnected to Philbert's disability—do not "add[] enough to the 'totality of the circumstances' to create a hostile work environment."  *See Antrobus v. New York City Health & Hosps. Corp.*, No. 19 Civ. 7449 (KPF), 2021 WL 964438, at *12 (S.D.N.Y. Mar. 15, 2021).  Even reading the SAC as generously as possible, Philbert's unhappy dealings with Ms. A resemble "[r]un-of-the-mill workplace conflicts," which, "troubling though they may be, do not rise to the level of an objectively hostile workplace."  *Harvin v. Manhattan & Bronx Surface Transit Operating Auth.*, 767 F. App'x 123, 128 (2d Cir. 2019) (summary order) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999)).  Colleagues' being "rude and hostile on various occasions . . . reflect[s] only fraught relationships," not a hostile work environment, particularly where the colleagues' conduct is not factually tied to the plaintiff's disability.[14]  *Id.*

The SAC therefore fails to state a claim as to hostile work environment.

---

[14] The only allegation that could possibly support a discriminatory inference is the incident in November 2018 in which Ms. A "disparaged and harassed" Philbert "about her age, weight, and physical characteristics."  SAC ¶ 52.  But that conduct is outside the limitations period.  And there is no allegation that Ms. A referred to Philbert's disability, as opposed to other non-protected physical characteristics.  Even if Ms. A had referred on that occasion to a physical characteristic associated with her alleged disability—for example, had Ms. A referred to Philbert's migraines—a single reference, without much more, would fall far short of stating a hostile work environment claim.  *Harvin*, 767 F. App'x at 128; *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 713 (2d Cir. 1998).

> d.     Retaliation

To allege a *prima facie* case of retaliation, a plaintiff must allege that: "(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006); *see Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999) (holding that Title VII retaliation test should be applied to ADA claims).

The SAC properly pleads one retaliation claim.

It alleges that, on June 24, 2019, Philbert asked Harrison to have the custodian restore power to the air conditioner. As pled, that satisfies the first two elements of a *prima facie* case.[15] SAC ¶ 70. A request for a reasonable accommodation may constitute protected activity. *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 149 (2d Cir. 2002). Here, the SAC alleges that the air conditioning was requested as a reasonable accommodation for Philbert's migraines. *See* SAC ¶ 48. Importantly, to make out a retaliation claim, the plaintiff "need not prove the merit of [her] underlying discrimination complaint"—*e.g.*, that the request was reasonable—"but only that [s]he was acting under a good faith, reasonable belief that a violation existed." *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) (citing *Grant v. Hazelett Strip-Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir. 1989); *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)); *see also Sarno*, 183 F.3d at 159 ("a plaintiff need not establish that the conduct [s]he opposed was actually a violation of the statute so long as [s]he can establish that he possessed good faith, reasonable belief that the underlying

---

[15] As to the complaints SAC alleges by Philbert to her union, SAC ¶¶ 61, 64, 68, these fail to show knowledge by the defendants of her requests, the second element of the test. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 125–26 (2d Cir. 2013) (plaintiff must show general corporate knowledge of protected activity).

challenged actions of the employer violated that law") (cleaned up).  It suffices that the SAC alleges—as it does—that Philbert believed the air conditioning was a reasonable accommodation for her migraine.

The third and fourth prongs are also met, as result of the allegation that, on June 25, 2019, Philbert was terminated.  SAC ¶ 72.  Termination is a quintessential adverse action. *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (termination an example of adverse employment action); *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 572 (S.D.N.Y. 2012) ("[T]ermination of employment is the quintessential materially adverse employment action.") (citing *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998)), *aff'd,* 526 F. App'x 124 (2d Cir. 2013) (summary order).  And the close temporal proximity—one day—between Philbert's request and her termination suffices to allege a causal connection.  *See Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) ("We have held that a close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation."); *Littlejohn*, 795 F.3d at 319–20 ("Littlejohn's allegations that the demotion occurred within days after her complaints of discrimination are sufficient to plausibly support an indirect inference of causation").

*Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87 (2d Cir. 2001), *as amended* (June 6, 2001), on which defendants rely, is inapposite.  There, after full discovery and on summary judgment, the evidence established that "the adverse employment actions were both part, and the ultimate product of, an extensive period of progressive discipline" beginning five months before the protected activity.  *Id.* at 95 (internal quotation marks omitted).  The record may bear out similar findings here that Philbert's termination, far from being a response to a request for

accommodation, was the culmination of a lengthy process of review.  The SAC indeed alleges Philbert's considerable disciplinary track record.  But that record's import on Philbert's termination awaits discovery.  The SAC, on its face, pleads a viable retaliation claim—that Philbert's request for air conditioning to accommodate her migraines prompted, almost immediately, her termination.  This claim, brought against DOE, survives.

The SAC's other retaliation claims are not well-pled.  The SAC alleges that Philbert was "falsely reprimanded" in retaliation for her complaints opposing discrimination and requesting accommodations.  SAC ¶¶ 91, 93.  On April 11, 2019, Harrison berated Philbert in front of her students and gave her an ineffective observation rating shortly after Philbert returned to work after her surgery.  *Id.* ¶ 66.  That evening, Philbert complained to Harrison about the discrimination she was allegedly experiencing.  *Id.* ¶ 67.  The next morning, Harrison "allowed a parent to interrogate and threaten" Philbert, *id.* ¶ 68, and on May 30, 2019, Lewis poorly rated Philbert's teaching, *id.* ¶ 69.

None of these allegations makes out a retaliation claim.  At the outset, a negative performance evaluation or official reprimand only constitutes an adverse employment action where negative ramifications in the conditions of employment result.  *Lawrence v. Mehlman*, 389 F. App'x 54, 56 (2d Cir. 2010) (summary order) (collecting cases); *Trachtenberg*, 937 F. Supp. 2d at 469.  The SAC does not allege that such occurred here.  For the same reasons, "being chastised in public is not an adverse employment action."  *Ramon-Malone v. City of New York*, No. 11 Civ. 8560 (PAC), 2013 WL 3835117, at *6 (S.D.N.Y. July 25, 2013) (citing *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005)).  That is because, even if unpleasant and stressful, the SAC does not plead that the harsh words from Harrison and unpleasant interaction with the parent worked a material change in the terms and conditions of Philbert's

employment.  *See Ziyan Shi v. N.Y. Dep't of State, Div. of Licensing Servs.*, 393 F. Supp. 3d 329,

338–39 (S.D.N.Y. 2019) ("causing Plaintiff to feel humiliated and afraid . . . does not rise to the

level of an adverse employment action") (collecting cases).  Those actions accordingly cannot

constitute retaliation under the ADA.  Aside from the claim based on Philbert's termination, the

SAC does not plead a retaliation claim under the ADA.

## CONCLUSION

For the foregoing reasons, the Court grants in parts and denies in part defendants' motion

to dismiss.  The Court sustains the SAC's ADA retaliation claim based on Philbert's June 25,

2019 termination, and otherwise dismisses all claims.

With the exception of the claims dismissed pursuant to the election of remedies bar, the

dismissal of all such claims is with prejudice.  That is because the SAC was Philbert's third

complaint, the Court having granted leave to Philbert to file a second amended complaint, *see*

Dkts. 15, 20, and she has not identified any factual basis on which these claims may be

rehabilitated.  *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

As to the claims dismissed pursuant to the election of remedies bar, that dismissal is

pursuant to Rule 12(b)(1) and hence jurisdictional.  Accordingly, it is without prejudice.  *Katz v.*

*Donna Karan Co., L.L.C.*, 872 F.3d 114, 121 (2d Cir. 2017).  That said, barring a change of law

or doctrine, there does not appear any available route for Philbert to plead these claims without

encountering the same bar.  *See Solomon v. Amazon.com, Inc.*, 838 F. App'x 638, 639 (2d Cir.)

(summary order), (affirming dismissal with prejudice of claim barred by election of remedies

doctrine, which rendered repleading futile), *cert. denied*, 142 S. Ct. 432 (2021).

The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 16 and 24 and to terminate defendants the City of New York, Camille Forbes, and Kerianne Harrison.

A case management order will issue shortly scheduling an initial pretrial conference and directing counsel, in advance, to submit a proposed case management plan.

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: January 7, 2022
New York, New York