Richard St. Paul, Esq.
Law Office of Richard St. Paul, Esq., PLLC
445 Hamilton Ave, Suite 1102
White Plains, NY 10601
Telephone: (914) 517-7568
Facsimile: (914) 517-7569

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
                                                    :
SHAKEMA PHILBERT,,                                  :
                                                    :
                                  Plaintiff,        :        No. 21-cv-3119 (PAE)(JLC)
                                                    :
                                                    :
          -against-                                 :
                                                    :        **MEMORANDUM OF LAW**
                                                    :
CITY OF NEW YORK, NEW YORK CITY                     :
DEPARTMENT OF EDUCATION, CAMILLE FORBES, :
and KERIANNE HARRISON,                              :
                                                    :
                                  Defendants.       :
------------------------------------------------------------------------x


**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGEMENT**




                              LAW OFFICE OF
                              RICHARD ST. PAUL ESQ., PLLC

                              By:  /s/ Richard St. Paul, Esq.
                              Richard St. Paul., Esq. (RP-6388)
                              445 Hamilton Avenue, Suite 1102
                              White Plains, New York 10601
                              (914) 517-7568 (tel.)
                              (914) 517-7569 (fax)

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 2

ARGUMENT ........................................................................................................................ 11

    A.    Standard on a Motion for Summary Judgment ................................................ 11

    B.    Plaintiff Has Established A Prime Facie Case of Retaliation.......................... 12

        1.    Plaintiff is Disabled Under the ADA ..................................................... 12

        2.    Plaintiff Has Established Causation ....................................................... 17

        3.    Defendant's Purported Non-Retaliatory Reasons Are Nothing More Than An Unlawful Pretext ................................................................................................. 18

CONCLUSION ...................................................................................................................... 26

# <u>TABLE OF AUTHORITIES</u>

**Cases**

<u>AAI Recoveries, Inc. v. Pijuan</u>, 13 F. Supp. 2d. 448, 450 (S.D.N.Y. 1998)                    11

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986)                    11

<u>Capobianco v. City of New York</u>, 422 F.3d 47, 56 (2d. 2005)                    13

<u>Cifra v. G.E. Co.</u>, 252 F.3d 205, 216 (2d Cir. 2001)                    17

<u>Cifra</u>, 252 F.3d at 216)                    18

<u>Clark Cnty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)                    18

<u>Colwell v. Suffolk County Police Dep't</u>, 158 F.3d 635, 646 (2d Cir.1998)                    14

<u>Cronin v. Aetna Life Ins. Co.</u>, 46 F.3d 196, 202 (2d Cir. 1995)                    11

<u>Dodd v. City University of New York</u>, 489 F.Supp.3d 219, 246, 267 (S.D.N.Y. Sept. 25, 2020)                    12

<u>Dodd</u>, 489 F. Supp. 3d at 247                    17, 18

<u>Eastway Constr. Corp. v. City of New York</u>, 762 F.2d 243, 249 (2d Cir. 1985)                    11, 12

<u>EEOC v. J.B. Hunt Transp., Inc.</u>, 321 F.3d 69, 74 (2d Cir. 2003)                    13

<u>Feliciano v. City of New York</u>, No. 14 Civ. 6751 (PAE)                    18

<u>Francis v. City of Meriden</u>, 129 F.3d 281, 284 (2d Cir.1997)                    14

<u>Gordon v. N.Y.C. Bd. of Educ.</u>, 232 F.3d 111, 117 (2d Cir. 2000)                    17

<u>Gorman-Bakos v. Cornell Co-op. Extension of Schenectady Cnty.</u>, 252 F.3d 545, 554 (2d Cir. 2001)                    17

<u>Hicks v. Baines</u>, 593 F.3d 159, 170 (2d Cir. 2010)                    17

<u>Hicks</u>, 593 F.3d at 170                    17

<u>Jacques v. DiMarzio, Inc.</u>, 386 F.3d 192, 201 (2d Cir. 2004)                    14

<u>Jermosen v. Mendelson</u>, No. 79 Civ. 4756, 1985 WL 3841, at *1 (S.D.N.Y. Nov. 8, 1985)                    11

<u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985)                    12

<u>Nationwide Life Ins. Co. v. Bankers Leasing Ass'n Inc.</u>, 182 F.3d 157, 160 (2d Cir. 1999)                    11

<u>Natofsky v. City of New York</u>, 921 F.3d 337, 349-53 (2d Cir. 2019)                    18

<u>Suffolk</u>, 158 F.3d at 646                    14

<u>Toyota Motor Mfg., Ky., Inc. v. Williams</u>, 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002)                    13

<u>Toyota</u>, 534 U.S. at 196–97, 122 S.Ct. 681                    14

<u>Toyota</u>, 534 U.S. at 200, 122 S.Ct. 681).                    14

<u>Treglia v. Town of Manlius</u>, 313 F.3d 713, 719 (2d Cir. 2002)                    12

<u>Tyler v. Bethlehem Steel Corp.</u>, 958 F.2d 1176, 1183 (2d Cir. 1992)                    17

<u>United States v. Bosurgi</u>, 530 F.2d 4756, 1110 (2d Cir. 1976)                    11

<u>United States v. New York City Dep't of Educ.</u>, 407 F. Supp. 3d 365, 403 (S.D.N.Y. 2018)                    18

<u>Univ. of Tex. Sw. Med. Ctr. v. Nassar</u>, 570 U.S. 338, 352, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013)                    17

<u>Weixel v. Bd. of Educ. of City of N.Y.</u>, 287 F.3d 138, 148 (2d Cir. 2002)                    12

<u>Wiradharja v. Bermuda Star Line, Inc.</u>, 802 F. Supp. 989, 992 (S.D.N.Y. 1992)                    11

<u>Ya-Chen Chen v. CUNY</u>, 805 F.3d 59, 70 (2d Cir. 2015)                    17, 18

<u>Zann Kwan v. Andalex Group LLC</u>, 737 F.3d 834, 846 (2d Cir. 2013)                    19

<u>Zann Kwan v. Andalex Grp. LLC</u>, 737 F.3d 834, 845 (2d Cir. 2013)                    17

<u>Zann Kwan</u>, 737 F.3d at 846)                    19

Statutes

29 C.F.R. § 1630.2(i) ........................................................................................................... 13
29 C.F.R. § 1630.2(j)(1)) ..................................................................................................... 13
29 C.F.R. § 1630.2(j)(2) ....................................................................................................... 14
42 U.S.C. § 12102(2) ............................................................................................................ 13
42 U.S.C. § 12102(2)(A) ....................................................................................................... 13

Plaintiff Shakema Philbert submits this memorandum of law in opposition to Defendant Department of Education's ("Defendant" or "DOE") motion for summary judgment.

## PRELIMINARY STATEMENT

The Court should deny Defendant's motion for summary judgment in its entirety. All of the arguments proffered by Defendant are meritless and contradicted by the record. Defendant unbelievably contends that Plaintiff's migraines are not a disability. This argument is absurd. Defendant had knowledge of Plaintiff's migraines (and the issues they caused) while she worked at PS 206 in 2014 running through her time at PS 194 in 2019. At no point in time did anyone from Defendant ever question the veracity of Plaintiff's migraines. In fact, while working at PS 194, Plaintiff had a conversation with Principal Harrison about the migraines during which Harrison admitted that she was "empathetic" and asked if Plaintiff needed any support regarding her physical space. Although Principal Harrison and Defendant failed to accommodate Plaintiff's migraines and retaliated against her, any assertion by Defendant that the migraines are illegitimate and not considered a disability is contradicted by their actions and is nothing more than a legal ploy to try and get this case dismissed. Furthermore, the record also shows that Defendant's proffered reason for Plaintiff's termination is nothing more than an unlawful pretext. The record demonstrates numerous weaknesses, implausibility's and contradictions is the proffered reason for Plaintiff's termination – bad evaluations. The record shows that Plaintiff received evaluations and ratings of either satisfactory or effective from 2011-2012 to 2016-2017, which amounts to 6 of the 8 years she worked for the Defendant. The only year that Plaintiff received an ineffective rating (2018-2019) the evaluation was a sham and was based upon a review of material and subjects that Plaintiff did not even teach. Furthermore, the Whetstone evaluation cites proffered by Defendant

are misleading.  Whetstone is not a program used by the NYC DOE to evaluate its teachers. Whetstone has no bearing on a teacher's Advance Overall Rating.  Plaintiff has shown the weaknesses, implausibility's, inconsistencies, and contradictions in all the reasons proffered by Defendant for her termination, all of which are illegitimate and served as an unlawful pretext.

## STATEMENT OF FACTS

The record is replete with evidence to demonstrate that Plaintiff is disabled under the ADA. Not only do Plaintiff's medical records that were provided to Defendant show that Plaintiff is disabled on account of her migraines (Philbert Dec. Ex. 2), but Defendant's actions and conduct throughout the duration of Plaintiff's employment demonstrate that they regarded her as disabled under the ADA.  At the time Plaintiff worked at both PS 206 under the supervision of Principal Forbes, and PS 194 under the supervision of Principal Harrison and Assistant Vice Principal Lewis, Plaintiff suffered from chronic migraines which often caused visual and speech impairments, difficulty hearing, difficulty sleeping, concentration issues, sensitivity to light and noise, nausea, fatigue, and pains associated with throbbing and pulses. (See Philbert Dec. ¶ 3, Ex. 1, pp. 19, 36-38, 42.)  Plaintiff's migraines affect her in all aspects of daily life and prevent her from living a full, fruitful life free from pain.  (Philbert Dec. ¶ 3.)  Plaintiff does not have the ability to enjoy being outside on a regular basis.  (Id.)  Plaintiff constantly needs to be inside away from bright lights, such as on a sunny day.  (Id.)  Plaintiff has trouble reading because she cannot concentrate for a long period without developing a throbbing headache.  (Id.)

Plaintiff had numerous medical procedures and leaves of absence from work to deal with the effects of her migraines, all of which Defendants knew of and never provided any indicia that they did not believe that the migraines were legitimate.  (Philbert Dec. ¶¶ 7-13, 16, 24, 26, 27, 32,

2

34, 41.) Plaintiff's supervisors knew about her disability based upon the medical records sent to the district about her surgeries, and medical condition.  (See Philbert Dec. ¶ 4, Ex. 2.)  For example, in or about November 2014, Plaintiff informed Defendant Forbes about her migraines and the problems that they caused.  (Id. ¶ 7.)  As a result of the migraines, Plaintiff scheduled numerous appointments with her physician and subsequently requested that PS 206 provide her with accommodations for her disability. (Id. ¶ 8.)  On February 13, 2015, Plaintiff requested leave from PS 206 to have surgery performed on February 18, 2015.  (Id. ¶ 9.)  On February 18, 2015, Plaintiff went to the Cerebrovascular Center at Mount Sinai Hospital where she underwent an angiogram and endovascular treatments of the right transverse sigmoid junction and coiling of the diverticula. (Id. ¶ 10 and Ex. 4.)  On February 23, 2015, Plaintiff's physician cleared her to return to work at PS 206 on March 4, 2015.  (Philbert Dec. ¶ 11 and Ex. 5.)

The 2014-2015 school year (which was Plaintiff's fourth year of teaching for Defendant) was the year Plaintiff had a health crisis which culminated in her having neurosurgery in February 2015.  (Id. ¶ 12.)  On June 9, 2015, Plaintiff notified Ms. Forbes about how stress impacts her health and disability by causing her to suffer migraines.  (Id. ¶ 13 and Ex. 8.)  In addition, Plaintiff sent an email to Principal Forbes on May 17, 2017, stating that she would not be able to return to work because of her migraines, back and hand pain.  (Philbert Dec. ¶ 16.)

Regarding her time at PS 194, in or around October 2018, Harrison became aware of Plaintiff's LODI and disabilities (Id. ¶ 24 and Ex. 17.)  In October 2018, Plaintiff informed Principal Harrison that she needed a reasonable accommodation to mitigate her migraines. (Id. ¶ 26.)  Specifically, Plaintiff requested use of the air conditioner in her classroom. (Id., Ex. 1, at pp. 36-38.)  On October 5, 2018, Plaintiff met with Harrison, and discussed her migraines. (Id. ¶ 27 and Ex. 18.)  Harrison stated "After one of the times she was absent she disclosed to me that she

3

suffered from migraines. We had a conversation about it. I told her I was very empathetic because I too suffer from migraines. I asked her if she needed anything, any support with regard to the physical space. She said no but made me aware that she may have to have surgery in the future." (Philbert Dec. ¶ 41 and Ex. 18.) Therefore, Harrison admitted that she had knowledge of Plaintiff's migraines, was empathetic, offered physical space support and knew of possible pending surgeries in the future.  (Id.)  The record irrefutably demonstrates that Defendant knew of Plaintiff's migraines, had access to her medical records evidencing the migraines and their effects, knew of the various medical leaves and surgeries that Plaintiff had for her migraines, and (importantly) never disputed or questioned the veracity of the migraines and the substantial effect that they had on major activities such as Plaintiff's life, work and daily routine.

The record shows that Plaintiff received evaluations and ratings of either satisfactory or effective from 2011-2012 to 2016-2017, which amounts to 6 of the 8 years she worked for the Defendant.  (Philbert Dec. ¶¶ 50-55.)  The only year that Plaintiff received an "ineffective" rating (2018-2019) the evaluation was a sham and was based upon a review of material and subjects that Plaintiff did not even teach.  (Id. ¶ 57, Ex. 46.)  The MOSL score or measure of student learning assessment for this evaluation was rated ineffective for the state science test.  (Id.)  This is an inaccurate and false assessment because Plaintiff did not teach science. (Id., Ex. 48.) The April 11, 2019 informal evaluation was marked ineffective based on observing Plaintiff teaching of math. However, this observation was baseless because Plaintiff did not teach math.  (Id.)

Furthermore, the Whetstone evaluation cites proffered by Defendant are misleading.  First and foremost, the only observations used in evaluating NYC DOE teachers are the observations under the Advance Overall Rating system, the DOE's official teacher rating system.  (Philbert Dec. ¶ 58.)  For the 2018-2019 school year, Plaintiff had a total of four observations under the Advance

4

Rating system which included 1 formal and 3 informal observations. (Id.)  Whetstone is not a program used by the NYC DOE to evaluate its teachers. (Id.)  Whetstone has no bearing on a teacher's Advance Overall Rating.  (Id.)  The alleged long extensive and fabricated history of Plaintiff's "poor performance" was presented by the Defendant at Plaintiff's termination hearing before the Chancellor's Committee.  (Id.)  Plaintiff was never provided an opportunity prior to the meeting to review the fraudulently created record and properly defend herself from DOE's relentless and blatant attempts to retaliate and defame Plaintiff's character and reputation.  (Id.)

Whetstone was a program being utilized exclusively at PS 194 (improperly) as a way for school leaders that were acting in a coaching, non-evaluative, role to provide feedback to teachers. (Philbert Dec. ¶ 59.)  All teachers employed at PS 194 were assigned a coach since PS 194 during the 2018-2019 school year was under "receivership" or state and superintendent control due to persistent low student academic growth, low achievement, and low grade-level proficiency.  (Id.) As of the 2022-2023 school year, PS 194 remains in receivership.  (Id.)

According to the Whetstone Education website, the platform is designed to "let teachers receive instant feedback from [coaching] observations, continue the conversation online, and access their total observation history."  (Id. ¶ 60.)  Plaintiff never had any access to engage with her coach on this platform regarding any of the alleged coaching observations or access to view and dispute the validity of the history being created about her on the platform.  (Id.)

The record contained here of alleged coaching feedback provided to Plaintiff through Whetstone is misleading.  Both Plaintiff and Plaintiff's co-teacher had the same "coach." (Philbert Dec. ¶ 61.) Primary engagement with their coach occurred during the common planning period where the teachers would meet to discuss curriculum and data (there were no students present). (Id.)  The record being presented here lists multiple different coaching observations for the same

5

date, a vast majority of the alleged coaching observations have no identified name to whom the record is written, and most disturbing several of these alleged coaching observations occurred on a Sunday (9/30/18; 4/14/19) and on a date the Plaintiff was absent (12/11/18).  (See DiBenedetto Dec. Ex. L; Philbert Dec. Ex. 49.)

The alleged Whetstone Education observations dated September 30, 2018, October 25, 2018, November 27, 2018, December 10, 2018, December 11, 2018, January 10, 2019, February 1, 2019, and April 14, 2019 never occurred and Plaintiff never received either this feedback or had a discussion regarding it. (Philbert Dec. ¶ 62, Ex. 50.)  Notably, Plaintiff was absent on December 11, 2018, and thus obviously could not be observed on a date she was absent. (Id., Ex. 49.)

The conduct of Principal Harrison and Vice Principal Lewis indisputably demonstrates that the ineffective rating Plaintiff received in 2018-2019 was an unlawful pretext and sham that they created to get rid of her.  On February 24, 2019, Plaintiff emailed Harrison informing her that she would be taking medical leave. (Philbert Dec. ¶ 32.)  Harrison responded by telling Plaintiff her leave had licensure and tenure implications.  (Id., Ex. 23.) Within minutes, Harrison and Lewis have a private email exchange where they expressed how they were both "over" the Plaintiff.  (Id.)  Then Harrison directed Lewis to calendar an observation for the two of them to observe the Plaintiff in reading the next morning, so they could "dot I's and cross T's". (Id.)  Importantly, the teacher's contract does not allow for "multiple observers." (Id.)  Page 65, Article 8 of the teaching contract states "no more than 1 evaluator may be present during an informal or formal observation. (Philbert Dec. ¶ 32, Ex. 24.) Harrison's actions here are clearly pretextual. The February 25, 2019 double observation never occurred because Harrison's plan was derailed when she instead allowed an unscheduled parent-led interrogation in her office. (Id.)  Not surprisingly, following this email exchange Plaintiff's observations that followed were drastically rated lower, first by Harrison and

then Lewis. (Id.)  Plaintiff was told at the beginning of the year that Lewis would be conducting her observations for the year. (Id.)  The same information was provided to Plaintiff's co-teacher. (Id.)  All of Plaintiff's co-teacher observations that took place, were done by Lewis. (Philbert Dec. ¶ 32.) Immediately following receipt of the written observation reports for both the April 11, 2019 and May 30, 2019 observations, Plaintiff filed a grievance with the UFT. (Id.)

Plaintiff's May 30, 2019 observation and the account written of it, is as fabricated as the April 4, 2019 observation report written for Plaintiff's co-teacher for a lesson that never took place. (Id. ¶ 33.)  Defendant's actions here is yet another part of the Defendant's relentless pursuit to complete the task of "Dot I's and cross T's" as identified in the February 24, 2019 email exchange between Harrison and Lewis. (Id., Ex. 23.) Defendant's actions here were an unlawful pre-text, designed to artificially and maliciously create a narrative of poor performance, for the purpose to aid Defendant in sustaining a pattern to abuse, defame, harass, sabotage, embarrass, humiliate, retaliate, deliberately inflict emotional distress on Plaintiff and terminate her. (Id.)

On or about March 5, 2019, Plaintiff went on medical leave because she had surgery to help correct her chronic migraines. (Philbert Dec. ¶ 34.)  On or about March 27, 2019, Plaintiff returned to work.  (Id.)  On April 4, 2019, only four days after Plaintiff returned from medical leave, and the first day following the ELA State exams, Harrison and Assistant Principal Colleen Lewis came in to "observe" Plaintiff.  (Id. ¶ 35, Ex. 25)

On the evening of April 11, 2019, Plaintiff wrote an email to Harrison expressing her frustrations with the on-going discrimination and hostile work environment being experienced. (Id. ¶ 36, Ex. 26.)  As a result, Harrison requested Plaintiff meet with her and Assistant Principal Colleen Lewis the next morning.  (Id.)  During the meeting on April 12, 2019, Harrison attempted to gaslight Plaintiff about the events.  (Philbert Dec. ¶ 36.)  Harrison denied the observation was a

"gotcha" as Plaintiff described in her email. (Id.) Plaintiff pointed out if Harrison were truly interested in seeing her teach, she would have planned to come to a teaching block Plaintiff took the lead for. (Id.) Plaintiff also taught more subjects than her co-teacher so there were more opportunities for Harrison to perform such an observation. (Id.) It was common knowledge that Plaintiff and her co-teacher were departmentalized just like the fifth- grade teachers. (Id.) None of the other departmentalized teachers, including Plaintiff's co-teacher, had any observations outside of the subject they led. (Philbert Dec. ¶ 36.) Harrison refused to acknowledge how her blatant action i.e., yelling in Plaintiff's face, supported the same culture of hostility that Plaintiff complained about month after month. (Id.) Harrison's actions signaled tacit approval for the on-going discriminatory conduct, actions of Ms. A, and the hostile environment that was created, as evidenced by her participation in it. (Id.)

Following the April 11, 2019 observation, Plaintiff filed a UFT grievance against Harrison for how the observation was conducted. (Id. ¶ 37, Ex. 27.) Harrison conducted the observation in bad faith and in violation of Plaintiff's teaching contract which states "an evaluator shall provide a score on any component that is observed." (Id.) It was impossible for Harrison to claim she observed Plaintiff teaching, a needed component of scoring using the Danielson Rubric. (Philbert Dec. ¶ 37. and Ex. 28.) Harrison's observation occurred during the math block that her co-teacher was leading. (Id., Ex. 29.) Even Plaintiff's co-teacher believed the observation was for her. (Id., Ex. 30.) All of Plaintiff's co-teacher's observations for the year took place in math. (Id.) It was well known that Plaintiff and her co-teacher were departmentalized like the fifth-grade teachers. (Id.) Plaintiff taught ELA subjects, reading and writing, and her co-teacher taught math. (Philbert Dec. ¶ 37.) Similarly, teachers from the fifth-grade team who were also departmentalized had all their observations for the year take place in the subject area they took the lead in. (Id., Ex. 31.)

Furthermore, Harrison had access to Plaintiff's class schedule.  (Id. ¶ 38.)  Harrison had knowledge of Plaintiff and her co-teacher being departmentalized as evidenced by Harrison's own email to Lewis on February 24, 2019 correlating Plaintiff with the subject of reading. (Id., Ex. 23.) The April 11, 2019 observation was as Plaintiff described in her email to Harrison later that evening "a gotcha." (Id.)  It was as Harrison previously stated to Lewis in her February 24, 2019 email exchange, a way to "dot her I's and cross her T's" so they could culminate their plan to get rid of Plaintiff.   (Philbert Dec. ¶¶ 32, 38, Ex. 23)

During Harrison's October 2020 interview with the SDHR, she stated the low ratings from observations such as the May 30, 2019 observation was part of her decision to terminate Plaintiff. (Id. ¶ 39, Ex. 32.)   On May 2, 2019 Harrison informed Miesha Edwards via email that she submitted her tenure decisions, later also confirmed in a May 21, 2019 email to her.  (Id.)  Just two hours after Harrison received the May 21, 2019 email, Lewis emailed Plaintiff to schedule her preconference for her May 30, 2019 formal observation. (Id. ¶ 39, Ex. 33.)

Regarding evaluations and ratings, during these years (including the 2018-2019 school year) Plaintiff never was provided a counseling memo, which violated Article 21B of the teacher contract. (Id. ¶ 44, Ex. 39.)  It should be noted that counseling memos are not disciplinary, and their purpose is to provide the teacher with an opportunity to work on areas that need improvement. (Id.)  supportive improvement". (Philbert Dec. ¶ 44, Ex. 39.) Additionally, Plaintiff was also never put on a teacher improvement plan (TIP), which is part of the DOE's Advance policy used for identifying poor performing teachers in need of support. (Id. ¶ 45, Ex. 40.)

The Measure of Student Learning (MOSL) score in Plaintiff's eighth and final year, specifically the ELA component which Plaintiff was principally responsible for as she taught the reading and writing curriculum that year, demonstrated she was a highly effective teacher. (Id. ¶

46.)  The science component, which was taught by a cluster teacher, the school's UFT chapter leader, drastically impacted Plaintiff's overall MOSL score. (Id., Ex. 41.)

In contrast, the 2018-2019 NY state exam scores for PS 194, Plaintiff's final year, showed students in her class outperformed all other testing grades in both ELA and math, with greater success seen in ELA, which again is the subject Plaintiff took primary responsibility for.  (Id. ¶ 47) The percentage of students in Plaintiff's class scoring at or above a level 2 was higher than 3rd graders, 5th graders and the school-wide average. (Id.)  Objective data of Plaintiff's impact as an educator all highlight that she's much more of an effective teacher than the Defendants would like the court to believe. (Id., Ex. 42.)

In her October 2020 interview with the SDHR, Harrison untruthfully stated that she "input the recommendation to extend" the Plaintiff, even though Harrison received weekly reminders asking her to indicate a decision on February 5, 2019. (Philbert Dec. ¶ 48 and Ex. 43.) Paragraph two of the probation extension agreements state Harrison had the option to either grant completion of probation; deny completion of probation and/or discontinued or grant an additional extension of probation. (Id., Ex. 44.) There is no limit on the number of extensions an untenured teacher can receive. (Id.)  Harrison's decision to terminate Plaintiff was not based on fact or truth. (Id.) Harrison has no credibility nor does her reasoning or the false narrative she attempted to create about the Plaintiff. (Id.)  Plaintiff's termination was the culminating act, and was the product of Harrison's relentless pursuit, as stated in her February 24, 2019 email to Assistant Principal Lewis, to "Dot I's and cross T's."   (Id. ¶¶ 32, 48, Ex. 23.)

## ARGUMENT

### A.    Standard on a Motion for Summary Judgment

'Summary judgment is a drastic remedy to be used sparingly and only where the requirements of Rule 56 have clearly been met." Jermosen v. Mendelson, No. 79 Civ. 4756, 1985 WL 3841, at *1 (S.D.N.Y. Nov. 8, 1985) (citing United States v. Bosurgi, 530 F.2d 4756, 1110 (2d Cir. 1976)). See also Nationwide Life Ins. Co. v. Bankers Leasing Ass'n Inc., 182 F.3d 157, 160 (2d Cir. 1999) ("We have long recognized that summary judgment is a drastic device, since its prophylactic function, when exercised, cuts off a party's right to present his case to the jury") (quoting Eastway Constr. Corp. v. City of New York, 762 F.2d 243, 249 (2d Cir. 1985) (internal quotations omitted).  In order to meet the requirements of Rule 56, the moving party bears the burden of establishing, through admissible evidence, that there are no genuine issues of material fact to be tried and that the facts as to which there is no such issue warrant judgment as a matter of law.  See Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995).

Once the moving party meets its burden, the burden then shifts to the non-moving party to demonstrate the existence of a genuine issue for trial.  Wiradharja v. Bermuda Star Line, Inc., 802 F. Supp. 989, 992 (S.D.N.Y. 1992).  To meet its burden, the non-movant must show that the factual issue in dispute is genuine and must offer sufficient evidence that would permit a jury to return a verdict in its favor.  See AAI Recoveries, Inc. v. Pijuan, 13 F. Supp. 2d. 448, 450 (S.D.N.Y. 1998).

The function of a District Court in deciding a motion for summary judgment is issue finding, not issue determination.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). In that regard, the Court is required to view the evidence submitted on the motion in favor of the

non-moving party, resolve all ambiguities in favor of the non-moving party and to draw all reasonable inferences in its favor.  See Eastway, 762 F.2d at 249.

As demonstrated below, there are numerous genuine, triable issues of material fact which preclude the entry of summary judgment in Defendant's favor.  Accordingly, the Court should deny Defendant's motion for summary judgment in its entirety.

**B.    Plaintiff Has Established A Prime Facie Case of Retaliation**

Claims for retaliation under the ADA are analyzed under the "McDonnell Douglas" burden-shifting framework established for analyzing Title VII, and other, retaliation claims.  Dodd v. City University of New York, 489 F.Supp.3d 219, 246, 267 (S.D.N.Y. Sept. 25, 2020) (citing Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).  "At the first step of this analysis, the plaintiff bears the burden of making out a prima facie case of retaliation." Id.  "To do so, she must establish by a preponderance of the evidence that (1) she engaged in an activity protected by the [ADA]; (2) the employer was aware of that activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." Id. (citing Weixel v. Bd. of Educ. of City of N.Y., 287 F.3d 138, 148 (2d Cir. 2002)). "A plaintiff's burden at this prima facie stage is de minimis." Id. (quoting Treglia, 313 F.3d at 719). "But she cannot meet it with 'purely conclusory allegations ..., absent any concrete particulars.'" Id. (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)).

**1.    Plaintiff is Disabled Under the ADA**

Defendant first contends that Plaintiff cannot establish that she is considered disabled within the statutory guidelines of the ADA.  (See Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Defendants Memo") at pp. 6-7.)  This argument is meritless.

A "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." Capobianco v. City of New York, 422 F.3d 47, 56 (2d. 2005) (quoting 42 U.S.C. § 12102(2)). "The existence of a disability must be determined on a 'case-by-case' basis." Id. (quoting Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002)).

"Not every impairment is a "disability" within the meaning of the ADA; rather, there are two requirements: the impairment must limit a major life activity and the limitation must be substantial." Id. (citing 42 U.S.C. § 12102(2)(A)).

"[M]ajor life activities are 'activities that are of central importance to daily life.'" Id. (quoting Toyota, 534 U.S. at 197, 122 S.Ct. 681). "The EEOC regulations define 'major life activities' to include 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" Id. (quoting 29 C.F.R. § 1630.2(i); see EEOC v. J.B. Hunt Transp., Inc., 321 F.3d 69, 74 (2d Cir. 2003)).

The regulations define the term "substantially limits" to mean:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

Id. at 57 (quoting 29 C.F.R. § 1630.2(j)(1)).

"Factors to consider in determining whether a major life activity is substantially limited include: the nature and severity of the impairment; its duration or expected duration; and the existence of any actual or expected permanent or long term impact." Id. (citing 29 C.F.R. §

13

1630.2(j)(2); see Toyota, 534 U.S. at 196–97, 122 S.Ct. 681 ("'[S]ubstantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree,'" and "thus clearly precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities.")

"The inquiry is not just on the effect an impairment has on tasks associated with a specific job, but it must focus primarily on whether the claimant is 'unable to perform the variety of tasks central to most people's daily lives.'" Id. (quoting Toyota, 534 U.S. at 200, 122 S.Ct. 681).

A plaintiff is also disabled within the meaning of the ADA if she is "regarded" by her employer as having a physical or mental impairment that substantially limits a major life activity. Id. (citing 42 U.S.C. § 12102(2)). "A 'regarded as' claim 'turns on the employer's perception of the employee' and is therefore 'a question of intent, not whether the employee has a disability.'" Id. (quoting Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 646 (2d Cir.1998) (quoting Francis v. City of Meriden, 129 F.3d 281, 284 (2d Cir.1997))). "It is not enough that the employer perceive the employee as 'somehow disabled'; the employer must regard the employee as 'disabled within the meaning of the ADA,' i.e., having an impairment that substantially limits a major life activity." Id. (quoting Suffolk, 158 F.3d at 646 (emphasis omitted); see Jacques v. DiMarzio, Inc., 386 F.3d 192, 201 (2d Cir. 2004)).

Here, the record is replete with evidence to demonstrate that Plaintiff is disabled under the ADA. Not only do Plaintiff's medical records that were provided to Defendant show that Plaintiff is disabled on account of her migraines (Philbert Dec. Ex. 2), but Defendant's actions and conduct throughout the duration of Plaintiff's employment demonstrate that they "regarded her as" disabled under the ADA. At the time Plaintiff worked at both PS 206 under the supervision of Principal Forbes, and PS 194 under the supervision of Principal Harrison and Assistant Vice Principal

Lewis, Plaintiff suffered from chronic migraines which often caused visual and speech impairments, difficulty hearing, difficulty sleeping, concentration issues, sensitivity to light and noise, nausea, fatigue, and pains associated with throbbing and pulses. (See Philbert Dec. ¶ 3, Ex. 1, pp. 19, 36-38, 42.) Plaintiff's migraines affect her in all aspects of daily life and prevent her from living a full, fruitful life free from pain. (Philbert Dec. ¶ 3.) Plaintiff does not have the ability to enjoy being outside on a regular basis. (Id.) Plaintiff constantly needs to be inside away from bright lights, such as on a sunny day. (Id.) Plaintiff has trouble reading because she cannot concentrate for a long period without developing a throbbing headache. (Id.)

Plaintiff had numerous medical procedures and leaves of absence from work to deal with the effects of her migraines, all of which Defendants knew of and never provided any indicia that they did not believe that the migraines were legitimate. (Philbert Dec. ¶¶ 7-13, 16, 24, 26, 27, 32, 34, 41.) Plaintiff's supervisors knew about her disability based upon the medical records sent to the district about her surgeries, and medical condition. (See Philbert Dec. Ex. 2.) For example, in or about November 2014, Plaintiff informed Defendant Forbes about her migraines and the problems that they caused. (Id. ¶ 7.) As a result of the migraines, Plaintiff scheduled numerous appointments with her physician and subsequently requested that PS 206 provide her with accommodations for her disability. (Id. ¶ 8.) On February 13, 2015, Plaintiff requested leave from PS 206 to have surgery performed on February 18, 2015. (Id. 9.) On February 18, 2015, Plaintiff went to the Cerebrovascular Center at Mount Sinai Hospital where she underwent an angiogram and endovascular treatments of the right transverse sigmoid junction and coiling of the diverticula. (Id. 10, Ex. 4.) On February 23, 2015, Plaintiff's physician cleared her to return to work at PS 206 on March 4, 2015. (Philbert Dec. ¶ 11, Ex. 5.)

The 2014-2015 school year (which was Plaintiff's fourth year of teaching for Defendant) was the year Plaintiff had a health crisis which culminated in her having neurosurgery in February 2015. (Id. ¶ 12.)  On June 9, 2015, Plaintiff notified Ms. Forbes about how stress impacts her health and disability by causing her to suffer migraines. (Id. ¶ 13, Ex. 8.) In addition, Plaintiff sent an email to Principal Forbes on May 17, 2017, stating that she would not be able to return to work because of her migraines, back and hand pain. (Id. ¶ 16.)

Regarding her time at PS 194, in or around October 2018, Harrison became aware of Plaintiff's LODI and disabilities (Id. 24, Ex. 17.)  In October 2018, Plaintiff informed Principal Harrison that she needed a reasonable accommodation to mitigate her migraines. (Philbert Dec. ¶ 26.)  Specifically, Plaintiff requested use of the air conditioner in her classroom. (Id., Ex. 1, at pp. 36-38.)  On October 5, 2018, Plaintiff met with Harrison, and discussed her migraines. (Id. 27 and Ex. 18.)  Harrison also stated "After one of the times she was absent she disclosed to me that she suffered from migraines. We had a conversation about it. I told her I was very empathetic because I too suffer from migraines. I asked her if she needed anything, any support with regard to the physical space. She said no but made me aware that she may have to have surgery in the future." (Id. ¶ 41 and Ex. 18.)  Therefore, Harrison admitted she had knowledge of Plaintiff's migraines, was empathetic, offered physical space support and knew of possible pending surgeries in the future.  The record irrefutably demonstrates that Defendant knew of Plaintiff's migraines, had access to her medical records evidencing the migraines and their effects, knew of the various medical leaves and surgeries that Plaintiff had for her migraines, and (importantly) never disputed or questioned the veracity of the migraines and the substantial effect that they had on major activities such as Plaintiff's life, work and daily routine.  This is indisputable and it is disingenuous

for Defendant to contend otherwise.  Therefore, the Court should deny the motion for summary judgment on this ground.

### 2.      Plaintiff Has Established Causation

Contrary to Defendant's contention, Plaintiff has also established causation.[1]  "[A]s to the fourth element, causation may be proven 'directly, through evidence of retaliatory animus directed against the plaintiff by the defendant,' or 'indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct.'" Dodd, 489 F. Supp. 3d at 247 (quoting Hicks v. Baines, 593 F.3d 159, 170 (2d Cir. 2010) (quoting Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)).  "Direct evidence is 'evidence tending to show, without resort to inference, the existence of a fact in question.'" Id. (quoting Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1183 (2d Cir. 1992)).  "Indirect evidence may consist of temporal proximity or other circumstantial evidence." Id. (citing Hicks, 593 F.3d at 170; Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 845 (2d Cir. 2013)). "The Second Circuit has 'not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship.'" Id. (quoting Gorman-Bakos v. Cornell Co-op. Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001)). "But the Supreme Court has suggested that the temporal proximity must be 'very close.'" Id. (quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273,

---

[1] Defendant argues that Plaintiff has failed to establish "but for" causation.  (See Defendant's Brief at pp. 7-8.)  However, under the burden-shifting framework for this ADA retaliation claim, this argument is premature.  As detailed herein, Plaintiff does not need to initially establish "but for" causation.  Only after (and if) Defendant demonstrates that it has a legitimate, non-retaliatory reason for Plaintiff's termination does the "but for" causation element come into play.  See Dodd, 489 F. Supp. 3d at 247 (citing Cifra v. G.E. Co., 252 F.3d 205, 216 (2d Cir. 2001); Ya-Chen Chen v. CUNY, 805 F.3d 59, 70 (2d Cir. 2015); Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 352, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013).  Accordingly, Plaintiff will address the "but for" causation issue below in Section B(3) of this memo of law.

121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam) (citation omitted).  "Generally, to show causation through temporal proximity alone, courts in this Circuit require no more than two months to have passed between a protected activity and an adverse action." Id. (citing Feliciano v. City of New York, No. 14 Civ. 6751 (PAE), 2015 WL 4393163, at *10 (S.D.N.Y. July 15, 2015) (collecting cases)).

Here, the close time frame concerning Plaintiff's accommodation request and her termination satisfy the causation prong.  On June 25, 2019, Plaintiff was informed that she was being terminated.  (Philbert Dec. ¶ 43.)  This is only one week after her most recent complaints and requests for accommodation regarding her migraines.  (Id. ¶¶ 40-42; SAC ¶¶ 70-71.)  This one-week time frame is sufficient to find an inference of causation.  Dodd, 489 F. Supp. 3d at 247.

### 3.    Defendant's Purported Non-Retaliatory Reasons Are Nothing More Than An Unlawful Pretext

Summary judgment should be denied because the record contradicts Defendant's proffered non-discriminatory reasons to terminate Plaintiff.  After a defendant has articulated non-retaliatory reasons for the employment action at issue, the plaintiff may still prevail by demonstrating that the stated rationale is pretextual.  United States v. New York City Dep't of Educ., 407 F. Supp. 3d 365, 403 (S.D.N.Y. 2018). Here, "the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." Dodd, 489 F. Supp. 3d at 247 (quoting Cifra, 252 F.3d at 216). "At the summary judgment stage, this requires the plaintiff to identify evidence sufficient to allow a rational factfinder to conclude 'that the desire to retaliate,' not the employer's proffered justification, 'was the but-for cause of the challenged employment action'." Id. (quoting Ya-Chen Chen, 805 F.3d at 70 (quoting Nassar, 570 U.S. at 352)); see Natofsky v. City of New York, 921 F.3d 337, 349-53 (2d Cir. 2019) (applying but-for causation standard to discrimination and

retaliation claims under the ADA and Rehabilitation Act). "But-for" causation does not require a showing that retaliation was an employer's sole motive, only that 'the adverse action would not have occurred in the absence of the retaliatory motive.'" Id. (quoting Zann Kwan v. Andalex Group LLC, 737 F.3d 834, 846 (2d Cir. 2013)).  "A plaintiff may show but-for causation by 'demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." Id. at 247-48 (quoting Zann Kwan, 737 F.3d at 846).

Defendant contends they had legitimate, non-discriminatory reasons to terminate Plaintiff. (See Defendant's Memo pp. 8-10.)  In support of this baseless contention, Defendant cites Plaintiff's performance and evaluations received during the 2018-2019 school year.  (Id. pp. 9-10.) As detailed below, Plaintiff can demonstrate that these proffered reasons are false and served as an unlawful pretext for her termination.  Plaintiff can show that there are weaknesses, implausibility's, inconsistencies and contradictions in all of the reasons proffered by Defendant, which is more than enough to defeat summary judgment.

The record shows that Plaintiff received evaluations and ratings of either satisfactory or effective from 2011-2012 to 2016-2017, which amounts to 6 of the 8 years she worked for the Defendant.  (Philbert Dec. ¶¶ 50-55.)  The only year that Plaintiff received an "ineffective" rating (2018-2019) the evaluation was a sham and was based upon a review of material and subjects that Plaintiff did not even teach.  (Id. ¶ 57 and Ex. 46.)  The MOSL score or measure of student learning assessment for this evaluation was rated ineffective for the state science test.  (Id.)  This is an inaccurate and false assessment because Plaintiff did not teach science. (Id., Ex. 48.) The April 11, 2019 informal evaluation was marked ineffective based on observing Plaintiff teaching of math. However, this observation was without any basis because Plaintiff did not teach math.  (Id.)

Furthermore, the Whetstone evaluation cites proffered by Defendant are misleading.  First, the only observations used in evaluating NYC DOE teachers are the observations under the Advance Overall Rating system, the DOE's official teacher rating system.  (Philbert Dec. ¶ 58.)  For the 2018-2019 school year, Plaintiff had a total of four observations under the Advance Rating system which included 1 formal and 3 informal observations. (Id.)  Whetstone is not a program used by the NYC DOE to evaluate its teachers and has no bearing on a teacher's Advance Overall Rating.  (Id.)  The alleged long extensive and fabricated history of Plaintiff's "poor performance" was presented by the Defendant at Plaintiff's termination hearing before the Chancellor's Committee.  (Id.)  The Plaintiff was never provided with an opportunity prior to the meeting to review the fraudulently created record and properly defend herself from administration's relentless and blatant attempts to retaliate and defame Plaintiff's character and reputation.  (Id.)

Whetstone was a program being utilized exclusively at PS 194 (improperly) as a way for school leaders that were acting in a coaching, non-evaluative, role to provide feedback to teachers. (Philbert Dec. ¶ 59.)  According to the Whetstone Education website, the platform is designed to "let teachers receive instant feedback from [coaching] observations, continue the conversation online, and access their total observation history."  (Id. ¶ 60.)  Plaintiff never had any access to engage with her coach on this platform regarding any of the alleged coaching observations or access to view and dispute the validity of the history being created about her on the platform.  (Id.)

The record contained here of alleged coaching feedback provided to Plaintiff through Whetstone is misleading. Both Plaintiff and Plaintiff's co-teacher had the same "coach." (Id. ¶ 61.) Primary engagement with their coach occurred during the common planning period where the teachers would meet to discuss curriculum and data (there were no students present).  (Id.)  The record being presented here lists multiple different coaching observations for the same date, a vast

majority of the alleged coaching observations have no identified name to whom the record is written, and most disturbing several of these alleged coaching observations occurred on a Sunday (9/30/18; 4/14/19) and on a date the Plaintiff was absent (12/11/18).  (See DiBenedetto Dec. Ex. L; Philbert Dec. Ex. 49.)  The alleged Whetstone Education observations dated September 30, 2018, October 25, 2018, November 27, 2018, December 10, 2018, December 11, 2018, January 10, 2019, February 1, 2019, and April 14, 2019 never occurred and Plaintiff never received either this feedback or had a discussion regarding it. (Philbert Dec. ¶ 62, Ex. 50.)  Plaintiff was absent on December 11, 2018, and obviously could not be observed on that date. (Id., Ex. 49.)

The conduct of Principal Harrison and Vice Principal Lewis indisputably demonstrates that the ineffective rating Plaintiff received in 2018-2019 was an unlawful pretext and sham that they created to get rid of her.  On February 24, 2019, Plaintiff emailed Harrison informing her that she would be taking medical leave. (Philbert Dec. ¶ 32.)  Harrison responded by telling Plaintiff her leave had licensure and tenure implications.  (Id., Ex. 23.) Within minutes, Harrison and Lewis have a private email exchange where they expressed how they were both "over" the Plaintiff.  (Id.)  Then Harrison directed Lewis to calendar an observation for the two of them to observe the Plaintiff in reading the next morning, so they could "dot I's and cross T's". (Id.)  Importantly, the teacher's contract does not allow for "multiple observers." (Id.)  Page 65, Article 8 of the teaching contract states "no more than 1 evaluator may be present during an informal or formal observation. (Philbert Dec. ¶ 32, Ex. 24.) Harrison's actions here are clearly pretextual. The February 25, 2019 double observation never occurred because Harrison's plan was derailed when she instead allowed an unscheduled parent-led interrogation in her office. (Id.)  Not surprisingly, following this email exchange Plaintiff's observations that followed were drastically rated lower, first by Harrison and then Lewis. (Id.)  Plaintiff was told at the beginning of the year that Lewis would be conducting

her observations for the year. (Id.)  The same information was provided to Plaintiff's co-teacher.

(Id.)  All of Plaintiff's co-teacher observations, that took place, were done by Lewis. (Philbert Dec.

¶ 32.) Immediately following receipt of the written observation reports for both the April 11, 2019

and May 30, 2019 observations, Plaintiff filed a grievance with the UFT. (Id.)

Plaintiff's May 30, 2019 observation and the account written of it, is as fabricated as the

April 4, 2019 observation report written for Plaintiff's co-teacher for a lesson that never took place.

(Id. ¶ 33.)  Defendant's actions here is yet another part of the Defendant's relentless pursuit to

complete the task of "Dot I's and cross T's" as identified in the February 24, 2019 email exchange

between Harrison and Lewis. (Id., Ex. 23.) Defendant's actions here were an unlawful pre-text,

designed to artificially and maliciously create a narrative of poor performance, for the purpose to

aid Defendant in sustaining a pattern to abuse, defame, harass, sabotage, embarrass, humiliate,

retaliate, deliberately inflict emotional distress on Plaintiff and terminate her. (Id.)

On or about March 5, 2019, Plaintiff went on medical leave because she had surgery to

help correct her chronic migraines. (Philbert Dec. ¶ 34.)  On or about March 27, 2019, Plaintiff

returned to work.  (Id.)  On April 4, 2019, only four days after Plaintiff returned from medical

leave, and the first day following the ELA State exams, Harrison and Assistant Principal Colleen

Lewis came in to "observe" Plaintiff.  (Id. ¶ 35, Ex. 25)

On the evening of April 11, 2019, Plaintiff wrote an email to Harrison expressing her

frustrations with the on-going discrimination and hostile work environment being experienced.

(Id. ¶ 36 and Ex. 26.) As a result, Harrison requested Plaintiff meet with her and Assistant Principal

Colleen Lewis the next morning.  (Id.)  During the meeting on April 12, 2019, Harrison attempted

to gaslight Plaintiff about the events.  (Philbert Dec. ¶ 36.)  Harrison denied the observation was a

"gotcha" as Plaintiff described in her email.  (Id.)  Plaintiff pointed out if Harrison were truly

interested in seeing her teach, she would have planned to come to a teaching block Plaintiff took the lead for. (Id.) Plaintiff also taught more subjects than her co-teacher so there were more opportunities for Harrison to perform such an observation. (Id.) It was common knowledge that Plaintiff and her co-teacher were departmentalized just like the fifth- grade teachers. (Id.) None of the other departmentalized teachers, including Plaintiff's co-teacher, had any observations outside of the subject they led. (Philbert Dec. ¶ 36.) Harrison refused to acknowledge how her blatant action i.e., yelling in Plaintiff's face, supported the same culture of hostility that Plaintiff complained about month after month. (Id.) Harrison's actions signaled tacit approval for the on-going discriminatory conduct, actions of Ms. A, and the hostile environment that was created, as evidenced by her participation in it. (Id.)

Following the April 11, 2019 observation, Plaintiff filed a UFT grievance against Harrison for how the observation was conducted. (Id. ¶ 37, Ex. 27.) Harrison conducted the observation in bad faith and in violation of Plaintiff's teaching contract which states "an evaluator shall provide a score on any component that is observed." (Id.) It was impossible for Harrison to claim she observed Plaintiff teaching, a needed component of scoring using the Danielson Rubric. (Philbert Dec. ¶ 37, Ex. 28.) Harrison's observation occurred during the math block that her co-teacher was leading. (Id., Ex. 29.) Even Plaintiff's co-teacher believed the observation was for her. (Id., Ex. 30.) All of Plaintiff's co-teacher's observations for the year took place in math. (Id.) It was well known that Plaintiff and her co-teacher were departmentalized like the fifth-grade teachers. (Id.) Plaintiff taught ELA subjects, reading and writing, and her co-teacher taught math. (Philbert Dec. ¶ 37.) Similarly, teachers from the fifth-grade team who were also departmentalized had all their observations for the year take place in the subject area they took the lead in. (Id., Ex. 31.)

Furthermore, Harrison had access to Plaintiff's class schedule.  (Id. ¶ 38.)  Harrison had knowledge of Plaintiff and her co-teacher being departmentalized as evidenced by Harrison's own email to Lewis on February 24, 2019 correlating Plaintiff with the subject of reading. (Id., Ex. 23.) The April 11, 2019 observation was as Plaintiff described in her email to Harrison later that evening "a gotcha."  (Id.)  It was as Harrison previously stated to Lewis in her February 24, 2019 email exchange, a way to "dot her I's and cross her T's" so they could culminate their plan to get rid of Plaintiff.   (Philbert Dec. ¶¶ 32, 38, Ex. 23.)

During Harrison's October 2020 interview with the SDHR, she stated the low ratings from observations such as the May 30, 2019 observation was part of her decision to terminate Plaintiff. (Id. ¶ 39 and Ex. 32.)  On May 2, 2019 Harrison informed Miesha Edwards via email that she submitted her tenure decisions, later also confirmed in a May 21, 2019 email to her.  (Id.)  Just two hours after Harrison received the May 21, 2019 email, Lewis emailed Plaintiff to schedule her preconference for her May 30, 2019 formal observation. (Id. ¶ 39 and Ex. 33.)

Regarding evaluations and ratings, during these years (including the 2018-2019 school year) Plaintiff never was provided a counseling memo, which violated Article 21B of the teacher contract. (Id. ¶ 44, Ex. 39.)  It should be noted that counseling memos are not disciplinary, and their purpose is to provide the teacher with an opportunity to work on areas that need improvement. (Philbert Dec. ¶ 44, Ex. 39.) Additionally, Plaintiff was also never put on a teacher improvement plan (TIP), which is part of the DOE's Advance policy used for identifying poor performing teachers in need of support. (Id. ¶ 45, Ex. 40.)

The Measure of Student Learning (MOSL) score in Plaintiff's eighth and final year, specifically the ELA component which Plaintiff was principally responsible for as she taught the reading and writing curriculum that year, demonstrated she was a highly effective teacher. (Id. ¶

46.)  The science component, which was taught by a cluster teacher, the school's UFT chapter leader, drastically impacted Plaintiff's overall MOSL score. (Id., Ex. 41.)

In contrast, the 2018-2019 NY state exam scores for PS 194, Plaintiff's final year, showed students in her class outperformed all other testing grades in both ELA and math, with greater success seen in ELA, which is the subject Plaintiff took primary responsibility for.  (Id. ¶ 47.)

In her October 2020 interview with the SDHR, Harrison stated (untruthfully) that she "input the recommendation to extend" the Plaintiff, even though Harrison received weekly reminders asking her to indicate a decision on February 5, 2019. (Philbert Dec. ¶ 48, Ex. 43.) Paragraph two of the probation extension agreements states Harrison had the option to either grant completion of probation; deny completion of probation and/or discontinued or grant an additional extension of probation. (Id., Ex. 44.) There is no limit on the number of extensions an untenured teacher can receive. (Id.)  Harrison's decision to terminate Plaintiff was not based on fact or truth. (Id.)  Harrison has no credibility nor does her reasoning or the false narrative she attempted to create about the Plaintiff. (Id.)  Plaintiff's termination was the culminating act, and was the product of Harrison's relentless pursuit, as stated in her February 24, 2019 email to Assistant Principal Lewis, to "Dot I's and cross T's."   (Id. ¶¶ 32, 48 and Ex. 23.)

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny the motion for

summary judgment in its entirety.

Dated: White Plains, New York
      June 13, 2023

                                         LAW OFFICE OF
                                         RICHARD ST. PAUL ESQ., PLLC

                                         By:  /s/ Richard St. Paul, Esq.
                                         Richard St. Paul., Esq. (RP-6388)
                                         445 Hamilton Avenue, Suite 1102
                                         White Plains, New York 10601
                                         (914) 517-7568 (tel.)
                                         (914) 517-7569 (fax)